**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **STANTON SQUARE, LLC** | * | |
| | * | **CIVIL ACTION NO.** |
| **versus** | * | |
| | * | **JUDGE:** |
| **THE CITY OF NEW ORLEANS,** | * | |
| **THE NEW ORLEANS CITY COUNCIL, and** | * | **SECTION:** |
| **FREDDIE KING, III, in** | * | |
| his official capacity as a member of the | * | **MAGISTRATE:** |
| **New Orleans City Council** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**COMPLAINT FOR INJUNCTIVE, DECLARATORY,**
**AND MONETARY RELIEF**

**NOW COMES** Plaintiff, Stanton Square, LLC (hereafter, "Plaintiff" or "Stanton Square"), who, through undersigned counsel, brings this complaint against Defendants, The City of New Orleans (hereafter, "the City"), the New Orleans City Council (hereafter, "City Council"), and Freddie King, III, in his official capacity as a member of City Council (hereafter, "Councilmember King") (collectively, "Defendants"), and states the following:

**PRELIMINARY STATEMENT**

1.      Plaintiff brings this action against Defendants for their discriminatory, unconstitutional, and unlawful actions that have delayed, prevented, and otherwise interfered with Plaintiff's attempts to construct a multi-family affordable housing apartment complex for working and middle-class individuals and families in the City of New Orleans.

2.      Plaintiff began plans to develop certain property in Lower Coast Algiers into an apartment complex called The Village at English Turn (hereafter, "The Village" or "the Development"). Within weeks of Plaintiff's application for a design review with the City of New Orleans' City Planning Commission, residents of the surrounding area, particularly residents of the mostly-White English Turn Golf Course and Country Club community and members of its

Property Owners' Association (hereafter, "ETPOA"), launched a discriminatory campaign in opposition to the Development. City officials, including Councilmember Freddie King, a resident of English Turn, ceded to the residents' demands and subsequently prevented the Development from moving forward in the permitting process.

3.      The ETPOA's communications with City councilmembers around this time included references to the Development's purported negative impact on the area's crime, safety, and property values. Such references reflect illegal discrimination and stereotypes of the intended residents of the Development.

4.      New Orleans has a profound lack of quality affordable housing for working and middle-class citizens. The Village, if built, would help alleviate the need for affordable housing, particularly among African Americans, Hispanics, and families with children.

5.      Lower Coast Algiers specifically lacks quality affordable housing. Consistent with this region's housing needs, the area on which the Village is to be built has been zoned for multi-family residential properties since the 1980s.

6.      Given the demographics of the surrounding housing market, the Village's apartments would be disproportionately occupied by African Americans, Hispanics, and families with children, who are over-represented among area households with incomes likely to rent homes at The Village's price points. The diverse population that would rent The Village's units would also alleviate the extreme segregation of English Turn and the surrounding area.

7.      Despite the property at issue being zoned precisely for Plaintiff's intended development, Defendants have taken actions to delay the Development indefinitely through the passage of an interim zoning district ("IZD"). The IZD placed an immediate moratorium on the issuance of permits for multi-family housing and commercial development on Plaintiff's property. At the same time the IZD was passed, Councilmember King, at the behest of the ETPOA,

submitted an application to permanently amend the future zoning designation of the Property to potentially downzone the Property to single-family or rural.  Thus, the interim zoning district was enacted simply to delay development until the Property can be downzoned, effectively banning the Development and depriving New Orleans of The Village's much-needed affordable housing.

8.      The City Council's actions, influenced by the discriminatory invective coming from residents and organizations like the ETPOA, have also incited a campaign of harassment and criminal vandalism against Plaintiff and its development. These efforts to intimidate and deter Plaintiff have escalated during the time that the City Council has delayed the development of The Village.

9.      This action is brought under the Fair Housing Act of 1968, as amended; 42 U.S.C. § 3601, *et seq.*; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*; the Civil Rights Act of 1871, as amended; 42 U.S.C. § 1983; Louisiana Equal Housing Opportunity Act; La. R.S. § 51:2601, *et seq.*; and the United States and Louisiana Constitutions.

10.     Defendants' actions in opposition to The Village have unlawfully discriminated against potential residents on the basis of race and familial status; have a disparate impact on the basis of race and familial status; and perpetuate segregation in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601, *et seq.*

11.     Plaintiff seeks declaratory relief, preliminary and permanent relief, a writ of mandamus, and damages for Defendants' unlawful behavior.

## JURISDICTION AND VENUE

12.     Plaintiff's claims, *inter alia*, arise under 42 U.S.C. § 1983, 42 U.S.C. § 3601, 42 U.S.C. § 2000, and the U.S. Constitution; thus, this Court has subject matter jurisdiction pursuant to federal question jurisdiction, 28 U.S.C. § 1331, 1343(a)(3), 2201, and 2202, and 42 U.S.C. § 3613(a).

13.     Under 28 U.S.C. § 1367, this Court has supplemental subject matter jurisdiction over Plaintiff's state law claims, because the state law and the federal law claims arise out of a common nucleus of operative facts.

14.     This Court has personal jurisdiction over all of the parties, because all of the parties are citizens of Louisiana.

15.     Venue is proper in this Court under 28 U.S.C. § 1391(b), because one or more defendants reside in the Eastern District of Louisiana, and because a substantial part of the events or omissions giving rise to the claims raised herein occurred in the Eastern District of Louisiana.

## THE PARTIES

16.     Plaintiff, Stanton Square, LLC, is a Louisiana limited liability company domiciled in the State of Louisiana. Plaintiff is the owner of certain real property described as Lots XB-1-B and XB-1-C of the English Turn Subdivision, located within the Fifth Municipal District and Thirteenth Planning District of the City of New Orleans (hereafter, "the Property"). The Property is bounded by English Turn Parkway, Woodland Highway, River Road, and Stanton Road, and it has a municipal address of 40 English Turn Parkway, New Orleans, Louisiana.

17.     Defendant, the City, is a political subdivision of the State of Louisiana, organized pursuant to and governed by the Home Rule Charter of the City of New Orleans (hereafter, "HRC").

18.     Defendant, City Council, is a legislative branch of the City, created and governed by the HRC.

19.     Freddie King, III is a citizen and resident of the State of Louisiana. Upon information and belief, Councilmember King resides in the English Turn neighborhood of Orleans Parish, Louisiana. He is, and was at all times relevant to this Complaint, a member of City Council, representing District "C." Councilmember King acted under the color of state law as a member of

City Council at all relevant times in this Complaint.

## **FACTUAL BACKGROUND**

### *New Orleans Segregation and Need for Additional Housing Stock*

1. Segregation has been and continues to be a problem for the City of New Orleans. The most widely-used measure of racial residential segregation is the dissimilarity index. The highest band of segregation on the dissimilarity index is a score of 60 and above. Orleans Parish, which encompasses most of the City, has a score of 65.8.

2. English Turn—the location of the subject Property—is even more segregated than the rest of New Orleans and is in need of additional housing. While New Orleans is a majority African American city, with more than 57% of New Orleanians being African American, as compared to 30.5% being White,[1] the area surrounding English Turn is between 20-40% African American. The adjoining Plaquemines Parish is only about 20% African American.

3. Any housing development, particularly an affordable housing development drawing its residents from the surrounding housing market, would be disproportionately occupied by African Americans and Hispanics, as compared to the existing English Turn and Plaquemines Parish populations, and would greatly reduce the existing segregation of English Turn and Plaquemines Parish.

4. Maps depict the story of segregation and White flight in the English Turn area. This map depicts the percentage of African American and Hispanic residents living in the areas surrounding the Property and English Turn, as reflected in the 2022 American Community Survey.

---

[1] Except where otherwise noted, population estimates and racial percentages refer to 2021 American Community Survey Estimates Subject Tables from the U.S. Census Bureau's website at data.census.gov.



5.      The census block groups that comprise "the Triangle" (Census Tract 617, marked in deep blue on the map above) are racially diverse, with between 86.3% and 97.6% of its population being African American and Hispanic. (For example, the two census block groups directly abutting English Turn and Plaquemines Parish are 85.8% African American and Hispanic.) There is then a clear demarcation between the racially-diverse Triangle and the other two components of the peninsula. The census block group that includes Plaquemines Parish is overwhelmingly White: its population is just 0.5% African American and Hispanic. English Turn, at 32.8% African American and Hispanic, is marginally better, but it is still less racially diverse than the Triangle.

6.      The City of New Orleans has a significant need for affordable housing in general. HousingNOLA noted in its 2022 report that the City is facing a housing crisis, giving the City a

failing grade for housing availability and affordability. There is a major gap between the price of housing and what its residents can afford. This gap is most acute in the 0-50% Area Median Income ("AMI") range, where the demand far outstrips the supply, resulting in renters either not finding housing or paying more of their income for it.

7.      According to the National Low Income Housing Coalition, of the people making between 30-50% of AMI, more than 40% are severely cost burdened, meaning they are spending more than half of their household income on housing costs. Thirty-nine percent (39%) of moderate-income households—people making between 51-80% of AMI—are also severely cost burdened. Overall, 63% of renters in New Orleans are cost burdened.

8.      This is compounded by the City's general lack of housing, with only 47 units available for every 100 people in need of affordable housing. According to the City's Master Plan, there is a need for almost 35,000 units to meet demand. HousingNOLA puts that figure at 47,000. This lack of housing has increased competition for available units, driving up prices and disadvantaging working and middle-class New Orleanians who have to compete for units with people who can afford to pay more.

9.      Indeed, the City noted in its Master Plan that promoting affordable housing choice is one of the City's top priorities, and that affordable multi-family housing is one of the "key ingredients of livability" for New Orleans. The Plan also emphasizes making the transition "from lower to higher density development" in order to "ensur[e] housing affordability and choice."

10.     Notably, the City is a recipient of federal Community Development Block Grant ("CDBG") funding. As a recipient, the City is required to certify to the United States Department of Housing and Urban Development ("HUD") that it is taking actions to affirmatively further fair housing choice. It is also required to complete, and periodically update, an analysis of impediments to fair housing choice. In order to certify to HUD that it is affirmatively furthering fair housing,

the City is required to take appropriate actions to overcome the effects of any impediments identified through that analysis.

11.     In spite of this certification, many of the City's actions have exacerbated the housing crisis. In 2007, the City Council voted to eliminate most social housing in the City, removing nearly 13,000 people from stable housing. Ninety-nine percent (99%) of those people were African American.

12.     The City Council has also had a history of implementing restrictive policies in clear contravention of the City's stated public policy goals, and in spite of the growing need for housing. The City Council has either taken no action or has expressly made the issues worse by offering administrative exceptions that undermine the effectiveness of even minor reforms.

13.     In recent years, Defendants have faced legal challenges to its discriminatory zoning tactics. For example, the United States Department of Justice ("DOJ") filed a lawsuit in this Court against the City under the Fair Housing Act ("FHA"), 42 U.S.C. § 3604(f)(1), and Title II of the American with Disabilities Act ("ADA"), 42 U.S.C. § 12132 for taking a series of actions that were designed to prevent the construction of a 40-unit housing development—The Esplanade— that would provide necessary housing and services for homeless and low-income New Orleanians with disabilities. The measures the City took included denying successive variance requests and the imposition of a moratorium to halt approval of bond financing for low-income housing projects in the City. The moratorium was imposed allegedly to study whether the housing market would support The Esplanade and two other projects.

***The City's History of Ceding to Neighborhood Associations and Enacting Restrictive Zoning Measures***

14.     In 2016, the City and the Housing Authority of New Orleans ("HANO"), in their HUD-required combined Fair Housing Assessment report, identified neighborhood associations'

opposition to multi-family housing throughout the City and the use of restrictive zoning as "factors that significantly create, contribute to, perpetuate, [and] increase the severity of segregation." The report acknowledged the effect of neighborhood associations lobbying City Council for the use of restrictive zoning measures to exclude housing developments that would otherwise allow an influx of people of color into their neighborhoods. To combat these factors, the City and HANO vowed in the Assessment to prioritize "zoning laws [that] assist [the] private development of affordable housing to address the overwhelming need."

15.     In fact, in that same report, the City noted that areas zoned S-RM1—like the Property in question—are "high opportunity" areas where it is "highly important that zoning laws assist private development of affordable housing to address the overwhelming need."

16.     A 2021 report prepared by the Louisiana Fair Housing Action Center found that, since 2008, neighborhood association boards, comprised mostly of White residents, have led successful "Not In My Backyard" ("NIMBY") campaigns that have killed or otherwise delayed 606 affordable homes throughout the City.

17.     It is against this backdrop that the New Orleans City Council acted to prevent the construction of Plaintiff's affordable, multi-family housing development.

***Plaintiff's Property and Plans for Development***

18.     Plaintiff is a limited liability company owned and incorporated by Xinhong Zhang. Ms. Zhang is Chinese American and is a member of a protected class.

19.     Sometime in 2020, Plaintiff commenced a search within Orleans Parish for a suitable and properly-zoned tract of land to develop a multi-family housing complex. After an exhaustive search, in March 2021, Plaintiff purchased the Property, an undeveloped tract of forested land in Lower Coast Algiers, with the intent of developing The Village.

20.     The Property has been zoned as Suburban Multi-Family Residential ("S-RM1")

since the 1980s. This zoning allows for the development of lower-density multi-family housing, with up to 35 units per acre. The Property is one of several lots in Lower Coast Algiers that are zoned S-RM1, a zoning designation indicating the City's belief that it is a prime placement for private development of affordable housing.

21.     The Property's future land use designation, which is set forth in the Future Land Use Map ("FLUM") of the Master Plan, also allows for multi-family development. The FLUM sets forth categories of allowable land uses and density for the purpose of directing the future development and redevelopment of private and public property in the City. When the Master Plan was adopted in 2010, the Property was given a Residential Multi-Family Post-War ("RMF-POST") designation, indicating that the long-range vision for this portion of Algiers was to enable some multi-family development alongside the single-family developments that already exist in the area.

22.     The Development plans are entirely consistent with the S-RM1 zoning designation's density and building regulations and satisfy the Master Plan's goals for the Property's future use. No variance or conditional permit would be required.

23.     Under the Master Plan, the City's stated goal for RMF-POST areas is to encourage the development of moderately dense, walkable neighborhoods near transit hubs. The Master Plan acknowledges that, to achieve this goal, it must allow developments with "densities higher than the surrounding neighborhood," especially where the project "is providing significant public benefits such as long-term affordable housing."

24.     Plaintiff's development fits squarely within the stated goals of the City for this area, as well as within the current S-RM1 zoning designation. The Village is designed to be a multi-family residential complex with 278 rental units, consisting of 104 one-bedroom units, 126 two-bedroom units, and 48 three-bedroom units on 16.8 acres. A significant portion of the units, including all of the one and two-bedroom units, would be priced to be affordable housing, based

-10-

on HUD's current metrics.

25.     The Development calls for the construction of nine (9) three-story separate buildings and two (2) four-story buildings. The Village would have approximately 16 units per acre—well within the 35 units per acre permitted under this zoning designation, and notably less than the 18 units per-acre density permitted on some lots within English Turn that are zoned for two-family housing.  Further, this type of development is in accordance with the Property's highest and best use.

26.     In addition to being in full compliance with the applicable zoning designation and building regulations, The Village is designed to blend in with the aesthetics of the surrounding area's lower density suburban character. It will be comprised of 40% permeable open space with a scenic detention pond, as well as the preservation of over two dozen oak trees.



27.     The Village is designed to accommodate many families with children.  The two- and three-bedroom units make up nearly two-thirds of The Village's 278 units.  The complex will also feature a swimming pool, clubhouse, and a playground to appeal to and serve families with

children.

28.     The Village's plans include additional community amenities, such as a gym, pickle ball courts, a dog park, a dog spa, walking trails, and storage units.

29.     Plaintiff's plan provided for quality housing that was affordable to and designed to meet the needs of New Orleans renters. If built, the Village would significantly relieve New Orleans' housing crisis by offering many units of quality and affordable rental housing, particularly to the benefit of racial minorities and families with children.

30.     Prior to the recent events that are the subject of this litigation, The Village was slated to begin opening in phases in December 2023, with full availability by the end of 2024.

***The Peninsula and Its Residents***

31.     The Property is situated on a bisected 10,000-acre peninsula of mostly undeveloped woodlands immediately south of the Intracoastal Waterway along the bend of the Mississippi River. The northeastern half is within Orleans Parish, and the southwestern half is within Plaquemines Parish (collectively, hereafter, "the Peninsula"). The entirety of the Orleans Parish area of the Peninsula is encompassed in Planning District Thirteen and is often referred to as "Lower Coast Algiers."

32.     At the center of the Peninsula is the English Turn community, a 650-acre gated community of wealthy residents whose homes circle a private 18-hole golf course designed by famed golfer Jack Nicklaus.  English Turn touts its country club facilities that include dining venues, a fitness center, a pool, tennis courts, nature trails, basketball courts, baseball fields, and a butterfly garden. There are 450 private homes in English Turn.

33.     The initial development of English Turn involved significant deforestation of the 650-acre area and the use of 1.2 million cubic yards of fill to meet the 1 to 5-foot thickness requirement by the Army Corps of Engineers.

**34.**     Lower Coast Algiers remains mostly White. English Turn specifically is more than 60% White, markedly less diverse than the Parish as a whole. It abuts Plaquemines Parish, which is almost entirely White, with about 20% of its residents being African American or Hispanic.

**35.**     While there are several parcels zoned to allow multi-family residential developments in Lower Coast Algiers, there are currently no such developments on the Peninsula. However, on the other side of the Intracoastal Waterway, there are several multi-family housing developments in and surrounding the Triangle. Many of these complexes are old and lower-quality and, upon information and belief, are either at or near capacity.

**36.**     Any affordable housing development in New Orleans—especially one targeting middle and working-class people and families with children—is likely to draw mostly African American and Hispanic residents, since the majority of the City's renters and the vast majority of the City's working class are of those backgrounds.

**37.**      Moreover, specific to Lower Coast Algiers, an affordable housing development near English Turn will draw its residents from the areas just north of the Intracoastal Waterway, which are disproportionately African American and Hispanic, as compared to the current occupants of English Turn and Plaquemines Parish.

***The Application and Neighborhood Opposition***

**38.**     After acquiring the Property in March 2021, Plaintiff spent several months researching local and regional apartment complexes to find the right architects and engineers for the Project, eventually settling on an architecture firm with experience designing high-quality multi-family housing.  Soon after, Plaintiff assembled a complete team of civil, geotechnical, structural, mechanical, and electrical engineers.

**39.**     Beginning in the fall of 2021, Plaintiff's architects, engineers, and other representatives commenced regular communications with City officials in the Department of

Safety and Permits, the City Planning Commission ("CPC"), and within the Sewerage and Water Board's ("SWBNO") administration to discuss Plaintiff's plans for The Village.

40.    Plaintiff's local architect began regular communications with staff members of the CPC about the design review and permitting process, while Plaintiff's civil engineering team immediately began communicating with SWBNO representatives and other City officials about the water and sewerage lines, drainage, and getting approval of their design plans.

41.    Under the CZO, developments over 40,000 square feet must undergo an initial review by the CPC's Design Advisory Committee ("DAC"). In other words, even though the Project was zoned for multi-family development by right, Plaintiff was required to undergo a review by the DAC.

42.    On May 18, 2022, Plaintiff submitted its project proposal application for the development of The Village.

43.    Within a matter of weeks after Plaintiff filed its development proposal to the DAC, intense opposition to The Village among residents of the Peninsula began, and a campaign to oppose and stop the Project was formed. More specifically, the opposition was, and continues to be, led by residents of the English Turn community, specifically the ETPOA.

44.    In organizing their opposition, the ETPOA formed an official Development Opposition Committee and several subcommittees tasked with hiring legal counsel and exploring legal avenues to stop the Project, lobbying City officials, and launching a public-relations campaign.

45.    Members of the ETPOA, along with a handful of other Peninsula residents, formed an unincorporated association called "Lower Coast Algiers" ("LCA") devoted exclusively to advocating against The Village. LCA launched a website dedicated to posting information about The Village's progress and LCA's efforts to stop it. The home page depicts an ariel view of the

Peninsula and the insulated English Turn community with the heading "Protect what we value most."

46.     As word of The Village continued to spread within the English Turn community, residents began sending discriminatory emails to City officials to oppose the Project. Many of these emails contained coded discriminatory language about the Development's alleged impact on crime, safety, and property values that rely on stereotypes about minorities and lower-income families with children. Examples include the following:

- "Apartment complexes in New Orleans have consistently failed, which issues including but not limited to residents living in less than adequate conditions, having high crime rates, and having concentrated health concerns & quality of life issues. . . . Therefore, my opposition is not based solely on location of this proposed complex but also on the general fact that apartment complexes fail in New Orleans."

- "The city of New Orleans has never had one single apartment complex anywhere in the city that was a success story. Every apartment complex built in this city failed miserably with people living in deplorable conditions, crime and other health concerns."

- "The number of residents possible at the Village . . . does not mirror the residential density in the area.  According to HUD regulations, there could be up to 6 adults per 3-bedroom apartments."

- "This development is an afront to our lifestyles."

47.     On August 28, 2022, the City's DAC held a meeting to consider The Village's design proposal. Approximately 80 English Turn residents arrived on hired buses to voice their objections. The minutes of the DAC meeting reflect more unfounded, discriminatory concerns voiced by the English Turn residents. According to these minutes, the residents were:

- "concern[ed] that residents of the apartment complex would bring additional crime and traffic to the area, since they aren't homeowners and would encourage economic disinvestment or flight from the area."

- "concern[ed] about taking care of families that would reside in the complex."

48.    The DAC voted to defer its decision on the design and moved to allow Plaintiff to resubmit its application to include a "full set of building elevations to determine massing, roof forms, and exterior details" and "3-D renderings to convey the entirety of the site and address comments regarding site connectivity, circulation, landscape buffers and site context with adjacent neighborhoods."

49.    The DAC scheduled Plaintiff to appear on the DAC's November 16, 2022 docket in order to conduct further review of the design, giving Plaintiff time to submit an amended application, as requested.

***The IZD Motion***

50.    Meanwhile, unbeknownst to Plaintiff, the ETPOA, through its counsel, worked closely and regularly with District C Councilmember King to introduce a motion that would place a building moratorium on the Property and halt the Development.

51.    Specifically, on October 6, 2022, Councilmember King submitted Motion No. M-22-447, docketed as Zoning Docket 98-22, for the establishment of the Lower Algiers Rural Protection Interim District ("the IZD Motion"). The IZD Motion was clearly targeting The Village. While it includes a few other properties around English Turn that are also zoned S-RM1, Plaintiff's property is the only one currently being developed.

52.    Plaintiff had no prior notice of the IZD Motion. Because the members of the English Turn neighborhood and surrounding area were involved in the drafting of the IZD Motion, they were deeply familiar with its language and the process. At least nineteen (19) individuals submitted written or electronic comments in support of the IZD Motion. As Plaintiff did not have the same advantage of prior knowledge of the IZD Motion, it did not appear or make public comment against the Motion.

53.    The IZD Motion directed the CPC to consider and conduct a public hearing on

-16-

whether "to establish by ordinance a new interim zoning district" that would "temporarily prohibit the development of multi-family residential homes in S-RM1 Multi-Family Districts . . . to allow for appropriate impact studies regarding drainage, road and utility infrastructure, municipal services for fire, police, emergency response services, and other public safety considerations, and an environmental impact analysis."

54.     Although it was framed as a directive to the CPC to consider, the IZD Motion had the practical effect of immediately placing a moratorium on the Development, as it prohibited any City agency from accepting any permit applications or issuing any permits that would conflict with the proposed IZD.

55.     Although Councilmember King initially brought the Motion, the City Council Clerk, apparently at the direction of the Executive Counsel to City Council, instructed Councilmember King to remove his name from the Motion on the basis that he owned property in the affected area. He then recused himself from voting. The IZD Motion instead was brought by Councilmember Leslie Harris.

56.     Having received no opposition to the IZD Motion, City Council voted to pass the IZD Motion, with four (4) councilmembers voting in favor, two (2) councilmembers absent, and Councilmember King recusing himself.

57.     The ETPOA's publicly-posted newsletters show that its members celebrated the IZD Motion's passage as a major victory in stopping The Village.  According to its October 2022 Newsletter, not only did the ETPOA lobby Defendants for the IZD, its legal team "worked closely with the office of . . . Council Member Freddie King, whose struggle with avoiding any appearance of impropriety in acting on a matter where he owns the property is recognized." It continued, "We are grateful to all who, determined to protect our community, undertook an effort given little chance of success."

*Plaintiff's IZD Motion Appeal*

58.     The IZD Motion allowed for anyone potentially aggrieved by the IZD to appeal to the Executive Director of the CPC, which would then make recommendations on whether to grant or the deny the Appeal using the following review standards: (1) Is the requested Appeal compatible with the surrounding land uses and structures?; (2) Does the requested Appeal provide for an efficient use of land?; (3) Will granting the requested Appeal increase traffic and safety hazards?; (4) Does the requested Appeal provide for an efficient parking layout?; (5) Will the requested Appeal increase community environmental impacts?; and (6) Does the requested Appeal preserve maximum tree canopy?

59.     As such, on or about November 15, 2022, Plaintiff, through its representative, Scott Steen, submitted an appeal of the IZD Motion, along with updated plans that addressed the appeal standards and the DAC's recommendations for the addition of pedestrian walkways, more residential amenities, and updated exterior details.

60.     Initially, upon the filing of the IZD Appeal, the DAC told Plaintiff that it could still consider Plaintiff's revised plans at its November 16, 2022 meeting, notwithstanding the IZD Motion. However, on the eve of the meeting, the CPC Executive Director intervened and informed Plaintiff that the matter would be taken off the DAC's docket.

*The City Planning Commission Hearing*

61.     The public hearing before the CPC on the IZD Motion was then set for December 13, 2022. The CPC consists of nine (9) members appointed by the Mayor and subject to approval by City Council. Among its functions, the CPC makes recommendations on the City's CZO, including whether to adopt proposed interim zoning districts or make modifications thereto.

62.     The CPC's December 13, 2022 public hearing on the IZD was held inside City Council chambers. Plaintiff and seven (7) other speakers appeared in opposition to the IZD

Motion. Only four (4) speakers from the ETPOA appeared in support. The LCA website indicated the ETPOA was told or otherwise was under the impression that the CPC would vote in favor of the IZD, and thus the ETPOA determined there was no need for supporters to appear en masse.

63.     After considering the public comments, the City Planning Commissioners engaged in a discussion about the merits of the IZD. Commissioner Lund questioned the validity of the proposed IZD, stating that it went against the intent of the Master Plan. Other Commissioners expressed incredulity at the use of an IZD to stop a by-right development.

64.     As noted by members of the CPC, the Development is in full compliance with the Master Plan, and the IZD would limit the development of needed housing stock within New Orleans.

65.     Upon completion of public comment and discussion, Commissioner Witry made a motion for denial of the IZD request, which was seconded by Commissioner Lund and adopted by unanimous consent by all seven (7) CPC members in attendance.

66.     Thereafter, on December 29, 2022, the Executive Director of the City Planning Commission issued his report on Plaintiff's IZD Appeal, finding in favor of Plaintiff and recommending that City Council grant the Appeal.

67.     As outlined in the detailed report, the Executive Director found that the Development met each of the six (6) review standards that City Council established in the IZD Motion. The report further noted that the Development would be consistent with the Master Plan, and that approving the Appeal would be consistent with the CPC's recommendation that the IZD Motion be denied.

*City Council's Passage of the IZD and Denial of Plaintiff's Appeal*

68.     Even though the CPC had denied the IZD request, the IZD and Appeal were then placed on City Council's Regular Meeting Agenda for January 19, 2023.

69.     Plaintiff and other opponents of the IZD Motion appeared for the January 19, 2023 Regular Meeting, expecting to have the opportunity to present comment. However, they discovered that the matter had been removed from the docket and continued to the February 2, 2023 Regular Meeting. According to the LCA website, members of the English Turn neighborhood were informed of the continuance well in advance of the January 19, 2023 Regular Meeting, and thus, again, did not appear en masse.

70.     On January 30, 2023, City Council issued public notice of the Regular Meeting agenda for February 2, 2023. Notwithstanding the CPC's report and recommendation, attached to the agenda was Motion No. M-23-57 calling for the preparation of an ordinance that would codify the IZD.

71.     The draft motion also modified the original IZD Motion in order to set forth appeal standards that would "more accurately reflect the independent studies prescribed" by the IZD. Under the draft Motion, Plaintiff could proceed with the Development if it could show that it: (1) complies with regulations and best practices for stormwater management and drainage; (2) has undergone a comprehensive traffic study; (3) has been designed to minimize impact on existing infrastructure and will account for any necessary upgrades; (4) has been designed to ensure availability of municipal services and will account for any necessary upgrades; and (5) has been designed to minimize impact on the environment and complies with environmental regulations. These new standards would have allowed Plaintiff to squarely address the ETPOA and other's alleged concerns about the Development's impact on drainage, water, traffic, availability of municipal services, and the environment.

72.     However, on February 1, 2023, without any explanation, Councilmember King's office circulated an amended version of Motion No. M-23-57, which omitted the above appeal criteria, leaving intact the appeal standards set forth in the initial IZD Motion. These standards in

the February 1 version included vaguer standards, such as whether the requested appeal was "compatible with the surrounding land uses and structures" and whether the requested appeal provided for an "efficient use of land." Instead of granting Plaintiff a meaningful procedural path to avoid the IZD by allowing it to present its own studies and design plans to address the very concerns that allegedly warranted the IZD, the City Council chose standards that afforded it much broader discretion to deny Plaintiff's appeal.

73.   At the February 2, 2023 Regular Meeting, City Council considered Motion Nos. 23-57 and 23-62 (denying Plaintiff's appeal). The ETPOA argued that it should be passed so that the vast area of Lower Coast Algiers can maintain its single-family and rural character indefinitely. They also repeated their unfounded concerns about stormwater flooding, strains on municipal services like police, ambulance, and water, increased traffic, potential damage to wildlife, and the removal of trees and fauna. They presented no substantive evidence to support the necessity of the IZD, relying mostly on hyperbole and innuendo.

74.   The City Council was put on notice of the discriminatory and practical consequences of passing the IZD. Plaintiff and other opponents of the IZD argued that the IZD would be legally improper and presented substantive evidence demonstrating that the proponents' concerns were arbitrary and unwarranted. Opponents included potential tenants of the Development who expressed continuing dismay at the lack of quality market-rate and affordable housing in New Orleans. Representatives of fair housing and other non-profit entities argued that using the IZD to effectively stop the Development and downzone the Property and surrounding properties to prevent the development of any multi-family housing would further segregation of Lower Coast Algiers.

75.   At the meeting, no City official pushed back against or expressed disagreement with the opposition expressed by residents, nor did any City official mention or explain the City's

legal obligations under federal and state fair housing rights laws in connection with the Development. In fact, no City official made any remark whatsoever, not even to address the CPC's unanimous recommendation against the IZD.

76.     Instead, at the conclusion of public comment, Councilmember King moved to vote on Motion Nos. 23-57 and 23-62 that would overrule the CPC, maintain the IZD, and deny Plaintiff's appeal. Six (6) councilmembers, including Councilmember King, voted in favor of both Motions, with one member absent for each vote.

77.     Motion No. 23-57 does not provide a single rational basis for overruling the CPC. To the contrary, it merely recites, in only non-descriptive terms, the studies to be performed during the duration of the IZD. Nowhere in the February IZD Motion does City Council give any reason as to *why* such studies are necessary.

78.     Throughout the IZD's entire legislative process, the *only* written reason provided by Defendants for the IZD was that the IZD was "deemed necessary and in the best interest of the City of New Orleans." Other than this vague and conclusory statement, Defendants have provided no written or verbal justification for their passage of the IZD.

79.     Upon information and belief, members of City Council, other than Councilmember King, voted in favor of the IZD for one reason—namely, to adhere to City Council's functioning "gentlemen's agreement" regarding zoning matters.  Upon information and belief, under this "gentlemen's agreement," each councilmember has agreed to vote in accord with the councilmember from the affected district. Here, because the IZD concerns Councilmember King's district, and Councilmember King voted in favor of the IZD, so too did the remaining councilmembers.

80.     The City Council's decision is a departure from ordinary procedure. According to the Louisiana Fair Housing Action Center, which regularly monitors City actions pertaining to

zoning of affordable and multi-family housing, it is exceedingly rare for the City Council to overrule the Planning Commission's recommendation and move forward to block the development of housing.

81.     An initial reading of the IZD Ordinance was held on February 16, 2023. City Council voted to adopt the Ordinance on March 9, 2023. The Ordinance was delivered to the Mayor on March 10, 2023, who neither approved nor disapproved. As such, and as required by law, the Ordinance became law on March 19, 2023.

82.     Since the passage of the initial IZD Motion on October 6, 2022, Plaintiff has been prohibited from furthering the Development and will continue to be prohibited under the current IZD until at least March 19, 2024, which City Council can extend up to two additional 180-day terms.

83.     The IZD, for which the City Council has not given any justification, is arbitrary and unnecessary. The issues it is supposedly meant to deal with are well-addressed by the design and permitting processes already in place. The IZD, at present, only affects Plaintiff and can be seen as a direct effort to halt Plaintiff's development in response to the racist backlash from ETPOA.

***The Stated Purpose of the IZD Is Pretextual***

84.     The stated purpose of the IZD—namely, to allow impact studies on traffic, flooding and drainage, utilities, and the removal of trees and fauna—is plainly pretextual.

85.     Each of the concerns that proponents of the IZD argue must be studied are already incorporated in the design review and permitting process. Specifically, under Article 4.5 of the CZO, all developments like The Village must undergo a review process that is open to the public.

86.     As noted by members of the City Planning Commission, the stated concerns about traffic, flooding and drainage, utilities, and the removal of trees and fauna apply equally to single-family developments as they do to multi-family developments.

87.     In fact, in terms of concerns about drainage and landscaping, a ban that prohibits multi-family development but allows single-family development makes little sense.  Both the CZO and New Orleans Code of Ordinances contain building regulations and requirements specific to drainage and stormwater management that a developer like Stanton Square must adhere to but that do not apply to single-family developments.   Stanton Square was already required to present a stormwater management plan that mitigates the drainage impact, and, according to Stanton Square's design team's early estimations, the Development's plans were already exceeding those regulations by twenty-five (25%) percent.

88.     Moreover, in reviewing Stanton Square's IZD appeal, the CPC Executive Director found that the Development met the review standards that City Council established in the IZD Motion, including standards regarding traffic and environmental impacts.

89.     If English Turn and other Peninsula residents are truly concerned about the impact on traffic, utilities, and design standards, they have every right to participate in the review process.

90.     The use of an IZD to completely halt this Development in order to allegedly study the exact same issues that would otherwise be addressed in the design review and permitting process marks a significant departure from the City's stated policies on supporting the development of affordable housing.

91.     Upon information and belief, this is the first time that Defendants have used an interim zoning district to target and block a by-right, multi-family housing development. Members of the City Planning Commission expressed incredulity at the use of an IZD to stop a by-right development, demonstrating how unorthodox this is.

***Defendants' Actions Have a Disparate Impact Based on Race and Familial Status and Perpetuate Segregation***

92.     Defendants' actions in blocking the Development and its housing stock have had a

disparate impact on African American and Hispanic residents in New Orleans. According to 2021 American Community Survey estimates, African Americans make up 60% of the City's renters, while only making up 48% of the City's homeowners.

93.     Despite making up roughly 60% of the City's population, African Americans and Hispanics make up more than 83% of the people living below the poverty level in New Orleans. More than half of African American households have a household income under the AMI, meaning that African American households are significantly more likely to be cost burdened and in need of affordable housing, as compared to Whites who make up just 15% of those below the poverty level.

94.     A disproportionate percentage of families with children are also eligible for affordable housing. Over 30% of families with children under the age of 18 in New Orleans are living below the poverty line, as compared to just 18.9% of families, generally. For single-parent households, this number is even higher: 49.8% of single-mother households with children are below the poverty level, making them the most in need of affordable housing.

95.     By interfering with the development of the Property and preventing housing stock that would bring African American and Hispanic residents and families with children to English Turn, Defendants' actions perpetuate and reinforce patterns of segregation in the City of New Orleans.

96.     The enactment of an IZD and other barriers to the development of multi-family housing in a predominantly-White area where affordable, multi-family housing is scarce specifically gives rise to racial disparities by limiting the types of housing opportunities mainly taken by African American and Hispanic residents, who are disproportionately likely to seek out affordable rental housing. That this was done, as surrounding areas more amenable to multi-family housing have seen rapid diversification, can only be seen as an effort to stop racial minorities and

families with children from continuing to move into the area.

***Defendants Work to Accomplish ETPOA's Goal of Making Zoning Permanent***

97.     Upon information and belief, the IZD is only the first step in protecting the Peninsula from multi-family developments. The ultimate goal is to permanently stop The Village by downzoning the Property and all other R-SM1 properties permanently to Suburban Single-Family or Rural Residential Estate zoning designations.

98.     Around the same time the IZD Motion was passed in October 2022, Councilmember King, at the behest of the ETPOA, submitted an application to downzone all R-SM1-designated properties on the Peninsula to a Suburban Single-Family or Rural Residential Estate zoning designation through the FLUM amendment process. This process is currently underway and expected to be completed this fall.

99.     Upon information and belief, Councilmember King has been and is continuing to encourage the ETPOA to continue and escalate its opposition to the Development.

100.     The ETPOA's NIMBY sentiments and efforts to prohibit *any* multi-family housing *anywhere* on the Peninsula are reflected in the insidious and discriminatory comments residents and others have made on The Village's social media page, including:

- "[A]ffordable housing . . . creates crime because people don't know how to govern themselves. Since Katrina St. Bernard Parish has seen more murders now that ever. The school is overran with people who bring the same mentality of violence from New Orleans to outlining areas."

- "I believe the track record of these affordable housing communities speaks for itself. . . . They will allow criminals of all elements to take over in time to come, which will degrade the properties surrounding area substantially.

- "Nobody wants section 8 by their million dollar homes."

- "Why would I want low income garbage around my house in a high dollar area? Get off you're a** and work harder if you wanna live back here in English Turn. And on top of this if y'all trully believe in

whatever this NIMBYism garbage is . . . why don't your developers put this garbage next to their own personal homes. If you wanna talk a big game about putting affordable housing up in high income areas di it in your own area before you try and f\*\*k up someone else's neighborhood."

- "I wouldn't want the crime, grass non existent because of cars parked in the yard, cars on stands, and the crime that seems rampant in these "'affordable housing developments . . . .'"

- "You DO NOT put such low rent housing in upper class neighborhoods, it will ruin that area in that it will destroy the worth of the houses, and those rich ones, that contribute $ to the city will MOVE AWAY from N.O. . . ."

- "Real Estate values and appraisals are determined by looking at comparable sales in the area and at the neighboring homes. If you build government funded, multi family projects around high end single family homes in a gated community, you're going to negatively impact the value of the homes in the community."

- "Orleans Parish is famous for these Large Scale, Cookie Cutter, Section 8 Housing Projects that Degenerate into Crime Ridden Slums!"

101.    The ETPOA's discriminatory ill will has spread from the Property to its owner, Ms. Zhang, who is of Chinese national origin. They have pointedly referred to her racial and ethnic background in communications and have repeatedly cast her as a foreigner who is ignorant of cultural norms. They have called her "simple minded," "spite[ful]," and a "piece of work."

*Opposition Escalates with Vandalism and Criminal Trespass*

102.    Residents of the English Turn community have recently began pursuing additional avenues to halt development on the Peninsula, such as lobbying for a new ordinance that would require a permit before a landowner on the Peninsula could remove trees and clear their land.

103.    This new measure was prompted by outrage expressed among English Turn residents that Plaintiff was continuing certain development activities permitted within the bounds of the IZD.  Specifically, because the IZD does not in any way prohibit the clearing of trees and fauna on the Property, nor is any permit required for the removal of trees on the Property, Plaintiff

recently resumed clearing the land, including the removal of trees and fauna that are of invasive and non-native species.

**104.** In response to these activities, on Saturday, July 8, 2023, the ETPOA announced a special meeting to its members through email and by flyers circulated around English Turn and the nearby Arbors Estates. The meeting was to discuss what measures could be taken to stop Plaintiff from clearing any further trees.

**105.** The following night, sometime between 10:00 p.m. on Sunday, July 9 and 6:00 a.m. on Monday, July 10, one or more individuals trespassed onto the Property and vandalized the tree-clearing equipment by spray-painting obscenities onto it and destroying parts of the equipment by inserting sticks and debris into the equipment's openings.







**106.**     Plaintiff reported the vandalism to the New Orleans Police Department.  An officer

arrived to the scene thereafter to investigate, and to date, no arrests have been made.

**107.**     At the ETPOA meeting the following day, there was some discussion about the

vandalism to the construction site and equipment.  During the discussion about the vandalism and Plaintiff's tree clearing, members of the ETPOA expressed anger toward the owner of Stanton Square, Dr. Zhang, claiming she was "stick[ing] a middle finger at [city] council."

***Injury to Plaintiff***

108.    Through their actions described herein, Defendants have injured and are continuing to injure Plaintiff, as well as the intended residents of The Village.

109.    Defendants' imposition of a pretextual building moratorium and denial of Plaintiff's IZD Appeal are inconsistent with the City's Master Plan and need for more affordable housing and constitutes a constructive denial of Plaintiff's application for The Village's development.

110.    Defendants' actions, including, *inter alia*, the constructive denial of Plaintiff's by-right development, the imposition of an interim zoning district to conduct entirely unnecessary and pretextual studies, the overruling of the CPC's unanimous recommendation against the IZD, the last-minute deletion of a new appeal procedure that would have set precise, achievable, and less discretionary standards for Plaintiff to meet in order to proceed with the Development, Councilmember King's resolute alliance with the ETPOA and disregard for the housing needs of his other constituents in District "C," especially in light of his conflict of interest as an affected property owner, and the failure of City Council to provide any written or verbal rationale for the IZD constitute unlawful interference with Plaintiff's right to build an affordable housing complex, because that project would benefit African Americans, Hispanics, and families with children.

111.    City Council and other City officials' tacit endorsement of the discriminatory sentiments espoused by opponents of The Village have the intent and effect of retaliating against Plaintiff for proposing an affordable housing complex for the Lower Coast Algiers and in chilling Plaintiff and others from proposing similar developments in the future.

112.    The entire sequence of events, including the initial passage of the IZD Motion, the sudden removal of Plaintiff's application from the DAC's docket, the rejection of the CPC's unanimous vote against the IZD, and the adoption of the IZD Ordinance have put the Development in serious jeopardy.

113.    Plaintiff cannot seek or obtain necessary permits until the IZD is lifted, which could be as late as March 2025, at which point, the Property may already be rezoned as single-family or rural. It cannot start work on the Project until those permits have been obtained.

114.    Plaintiff has expended significant financial resources in planning The Village and revising its plans to meet the requirements of the DAC and CPC, including, but not limited to, project management expenses and costs incurred in developing and revising the site plan, architectural drawings, engineering plans, and other plans.

115.    Plaintiff continues to seek to develop The Village at the Property. Defendants' actions continue to prevent Plaintiff from developing The Village or a similar affordable housing development at that site.

116.    In addition to the injuries that Plaintiff has suffered and continues to suffer, Defendants' actions have had and continue to have the purpose and effect of limiting housing opportunities for racial minorities and families with children who would live at The Village.

117.    Defendants' actions are disproportionately denying housing opportunities in Lower Coast Algiers to racial minorities and families with children.

118.    Defendants' actions have the purpose and effect of perpetuating racial segregation in housing in Lower Coast Algiers and on the Peninsula, because those actions will prevent African American and Hispanic families from the surrounding areas from moving into the area.

119.    Defendants' actions constitute unlawful interference with housing opportunities on the basis of race and familial status.

120.    The unnecessary delay and loss of housing opportunities to African Americans, Hispanics, and families with children, due to unlawful discrimination, constitute an irreparable harm to those groups. Plaintiff's development of The Village would provide desperately needed affordable housing to individuals and families in the Lower Coast Algiers area and on the Peninsula.

121.    Through their actions described above, Defendants have acted intentionally, maliciously, and with willful, malicious, wanton, and reckless disregard for federal and state fair-housing and non-discrimination laws.

122.    As a proximate result of the acts and practices described above, Plaintiff has, is, and will continue to suffer great and irreparable loss and injury in the future, including, but not limited to, economic losses and a deprivation of Plaintiff's right to develop racially-integrated affordable housing for individuals and families free from discrimination based on race and familial status.

## FIRST CAUSE OF ACTION
### Fair Housing Act, 42 U.S.C. § 3604

123.    Plaintiff incorporates by reference the above allegations as fully set forth herein.

124.    Defendants, through their actions and omissions, and the actions and omissions of their agents described above, are liable for the violation of Plaintiff's rights under the federal Fair Housing Act, 42 U.S.C. § 3604(a), under which it is unlawful "[t]o sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin" by, *inter alia*, enacting the IZD and denying Plaintiff's ability to obtain the permitting it needs to develop, Defendants have made housing unavailable to renters in the New Orleans region.

125.    Defendants are further liable under 42 U.S.C. § 3604(b), which makes it unlawful

to "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin" by, *inter alia*, enacting the IZD and denying Plaintiff's ability to obtain permitting it needs to develop, Defendants have imposed a discriminatory term and condition on the process that Plaintiff's proposed development is required to undergo.

126.    Defendants' actions to obstruct and delay the Development through the passage of an illegitimate interim zoning district are and have been based on discriminatory motives related to the race of the likely residents of The Village, specifically the likelihood that the population of The Village will include many African Americans, Hispanics, and families with children.

127.    Defendants' actions impose a disproportionate harm on African Americans and other minorities by depriving them of affordable housing in Lower Coast Algiers. Defendants' change in enforcement and imposition of new policies disproportionately deprives African American and Hispanic residents of housing opportunities in a manner that goes beyond pre-existing disparities.

128.    Defendants' actions perpetuate and reinforce patterns of segregation in the City of New Orleans and its housing market.

129.    Plaintiff has been injured by Defendants' discriminatory conduct and has suffered damages as a result.

130.    Defendants' conduct was intentional, willful, and made in reckless disregard of the known rights of others.

131.    Wherefore, Plaintiff is entitled to a judgment that Defendants have violated 42 U.S.C. § 3604 and is entitled to damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### Fair Housing Act, 42 U.S.C. § 3617

**132.**    Plaintiff incorporates by reference the above allegations as if fully set forth herein.

**133.**     Defendants, through their actions and the actions of their agents described above, are liable for the violation of Plaintiff's rights under the federal Fair Housing Act, 42 U.S.C. § 3617, under which "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." Defendants' actions have interfered with Plaintiff's efforts to build and operate an affordable housing development that would disproportionately benefit African Americans and other minorities and constitute retaliation against Plaintiff for proposing a project that would serve these groups.

**134.**    Defendants' actions to obstruct and delay the Development through the passage of an illegitimate interim zoning district are and have been based on discriminatory motives related to race, national origin, and familial status of its likely residents, specifically the likelihood that the population of the Development will include many African Americans and other minorities, or others who, because of their personal status, are protected by federal, state, or local law from discrimination. Defendants' imposition of an interim zoning district, combined with their attempt to bar any subsequent attempts by Plaintiff to develop multi-family housing on the Property, are a scorched-earth effort to punish Plaintiff for even attempting to develop multi-family affordable housing.

**135.**    Defendants' actions also impose disproportionate harms to African Americans and other minorities by actively barring the development of any kind of affordable multi-family housing in Lower Coast Algiers, further exacerbating an affordable housing shortage in New

-34-

Orleans and impeding racial desegregation in Lower Coast Algiers and the Peninsula.

136.    Plaintiff has been injured by Defendants' conduct and has suffered damages as a result.

137.    Defendants' conduct was intentional, willful, and made in reckless disregard of the known rights of others.

138.    Wherefore, Plaintiff is entitled to a judgment that Defendants have violated 42 U.S.C. § 3617 and is entitled to damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d *et seq.*

139.    Plaintiff incorporates by reference the above allegations as if fully set forth herein.

140.    The City is a recipient of federal Community Development Block Grant ("CDBG") funding.

141.    Defendants, through their actions and the actions of their agents described above, are liable for the violation of Plaintiff's rights under Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d *et seq.*, under which, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." The discrimination from which The Village is suffering will directly and adversely impact the right of the intended beneficiaries of The Village's development and operation, which will disproportionately include African Americans and other racial minorities, to be free from discrimination.

142.    Plaintiffs have been injured by Defendants' discriminatory conduct and have suffered damages as a result.

**FOURTH CAUSE OF ACTION**
**Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d** *et seq.*

143.     Plaintiff incorporates by reference the above allegations as if fully set forth herein.

144.     Defendants, through their actions and the actions of their agents described above, are liable for the violation of Plaintiff's rights under Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d *et seq.*, under which, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." The discrimination Plaintiff is suffering will directly and adversely impact the right of the intended beneficiaries of Plaintiff's development and operation of The Village, which will disproportionately include African Americans and other racial minorities, to be free from discrimination.

145.     Plaintiff has been injured by Defendants' discriminatory conduct and has suffered damages as a result.

**FIFTH CAUSE OF ACTION**
**Violation of the Louisiana Equal Housing Opportunity Act**
**La. R.S. § 51:2601,** *et seq.*

146.     Plaintiff incorporates by reference the above allegations as if fully set forth herein.

147.     Defendants, through their actions and omissions, and the actions and omissions of their agents described above, are liable for the violation of Plaintiff's rights under the Louisiana Equal Housing Opportunity Act, La. R.S. § 51:2606(1), under which it is unlawful "[t]o sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, national origin, or natural, protective, or cultural hairstyle."

148.     Defendants' actions to obstruct and delay the Development through the passage of

an illegitimate interim zoning district are and have been based on discriminatory motives related to the race of the likely residents of The Village, specifically the likelihood that the population of The Village will include many African Americans, Hispanics, and families with children.

149.    Defendants' actions impose a disproportionate harm on African Americans and other minorities by depriving them of affordable housing in Lower Coast Algiers. Defendants' change in enforcement and imposition of new policies disproportionately deprive African American and Hispanic residents of housing opportunities in a manner that goes beyond pre-existing disparities.

150.    Defendants' actions perpetuate and reinforce patterns of segregation in the City of New Orleans and its housing market.

151.    Plaintiff has been injured by Defendants' discriminatory conduct and has suffered damages as a result.

152.    Defendants' conduct was intentional, willful, and made in reckless disregard of the known rights of others.

153.    Wherefore, Plaintiff is entitled under La. R.S. §51:2613 to redress for Defendants' violation of La. R.S. §51:2606(1), including temporary and permanent injunctive relief, actual and punitive damages, and an award of attorneys' fees and costs.

**SIXTH CAUSE OF ACTION**
**Violation Of Due Process**
**Under 42 U.S.C. § 1983 and the Louisiana Constitution**

154.    Plaintiff incorporates by reference the above allegations as if fully set forth herein.

155.    Defendants have deprived Plaintiff of its property and liberty interests under color of law without due process of law in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Louisiana Constitution.

156.    A "hallmark of procedural due process that 'a biased decisionmaker is

constitutionally unacceptable.'" *Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 897 n.8 (6th Cir. 1991) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)) (alteration adopted). This includes decisions involving zoning and ordinances. *Id.*

157.    Plaintiff has the right to develop the Property free from arbitrary restrictions imposed by biased officials.

158.    City Council's passage of the IZD and its denial of Plaintiff's IZD Appeal violate the Due Process Clause of the U.S. and Louisiana Constitutions. Because of the "gentleman's agreement" among the Councilmembers, Defendants' actions were premised upon the whims of a biased decisionmaker, namely Councilman King. City Council's vote in unison with Councilman King was arbitrary and capricious and deprived Plaintiff of any meaningful due process.

159.    Additionally, Plaintiff possesses a liberty interest to engage in whatever legal business it elects to pursue, including the design and construction of a multi-family housing complex, free from Defendants' interference based solely on the fact that a group of nearby wealthy homeowners do not want to live next to renters, most of whom will likely be African American or other minorities.

160.    By engaging in the scheme set forth above to provide an empty, meaningless process, with a pre-determined result—i.e., to enact the Interim Zoning District and deny Plaintiff's appeal of same—Defendants impermissibly deprived Plaintiff of its property interest without due process of law.

161.    Defendants' actions against Plaintiff and its Property were arbitrary, capricious, unreasonable, and do not bear a substantial relationship to the New Orleans Master Plan, Louisiana law, or the circumstances of the case.

162.    As a result, Plaintiff has suffered, and will continue to suffer, the deprivation of its vested rights under the United States Constitution and the Louisiana Constitution.

163.    Wherefore, Plaintiff is entitled to a judgment that Defendants have violated 42 U.S.C. § 1983 and is entitled to injunctive relief and damages in an amount to be proven at trial.

## INJUNCTIVE RELIEF

164.    Plaintiff incorporates by reference the above allegations as if fully set forth herein.

165.    Plaintiff is entitled to injunctive relief, mandatory and prohibitory, against Defendants, preventing them from continuing the course of actions that wrongfully deprive Plaintiff of its constitutional rights and that cause it other harm.

166.    Although Plaintiff may be entitled to monetary compensation for its special and general damages in an amount determined just on account of past, current, and future injury, Defendants have acted unconstitutionally and have violated the Fair Housing Act and other state and federal statutes.

167.    These wrongful and unlawful actions are presently ongoing, so that Plaintiff is entitled to a preliminary and permanent injunction against their continuation.

## REQUEST FOR ISSUANCE OF A WRIT OF MANDAMUS

168.    Plaintiff incorporates by reference the above allegations as if fully set forth herein.

169.    Plaintiff is entitled to the immediate issuance of a writ of mandamus, requiring Defendants to forthwith dissolve the IZD or, alternatively, grant the appeal of the IZD that was applied for by Plaintiff.

170.    Said writ of mandamus should be issued, because the delay involved in obtaining ordinary relief may cause injustice.

**WHEREFORE**, Plaintiff, Stanton Square, LLC, respectfully requests the following relief against all Defendants, jointly and severally:

A.    Enter judgment on each count in favor of Plaintiff;

B.    Enter judgment enjoining Defendants from enforcing the Interim Zoning District;

C.      Enter an order of declaratory relief granting each of the requested declarations in the Counts listed above;

D.      Enter judgment issuing a writ of mandamus directing Defendants to dissolve the IZD, or, alternatively, to grant Plaintiff's IZD Appeal or to show cause to the contrary;

E.      Enter a finding of joint and several liability for the Defendants named in each count of this Complaint;

F.      Award compensatory damages, special damages, consequential damages, direct and indirect damages, incidental damages, general damages, exemplary damages, punitive damages, just compensation, and other monetary relief in an amount to be proven at trial;

G.      Award punitive damages to Plaintiff in an amount to be determined by the this Honorable Court that would punish Defendants for their willful, wanton, and reckless conduct alleged herein and that would effectively deter Defendants from engaging in similar conduct in the future;

H.      Award Plaintiff pre-judgment and post-judgment interest, and their costs of litigation and reasonable attorneys' fees pursuant to 42 U.S.C. § 1983, La. R.S. §51:2613, and other statutes and common law; and

I.      Award Plaintiff such all other relief as this Honorable Court deems just, appropriate, and equitable.

Respectfully Submitted,


**/s/   *Randall A. Smith*** 
**RANDALL A. SMITH, T.A. (No. 2117)**
**REAGAN R. WILTY (No. 35292)**
        **OF**
**SMITH & FAWER L.L.C.**
201 St. Charles Ave., Suite 3702
New Orleans, LA 70170
Telephone: (504) 525-2200
Facsimile: (504) 525-2205

        **—and—**

**YIYANG WU** (motion for admission *pro hac vice*
pending)
**DAVID DEPRIEST** (motion for admission *pro hac
vice* pending)
        **OF**
**RELMAN COLFAX PLLC**
1225 19th Street NW, Suite 600
Washington, DC 20036

***Counsel for Plaintiff, Stanton Square, LLC***