**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

STANTON SQUARE, LLC

versus

THE CITY OF NEW ORLEANS,
THE NEW ORLEANS CITY COUNCIL,
and FREDDIE KING, III, in
his official capacity as a member of the New
Orleans City Council

CIVIL ACTION NO. 2:23-cv-05733

JUDGE: Brandon S. Long

MAGISTRATE: Michael North

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

FACTUAL BACKGROUND ........................................................................................... 1

LEGAL ARGUMENT ..................................................................................................... 6

  I.   Plaintiff Has Stated a Claim for Discrimination Under 42 U.S.C. § 3604. ......................... 6

    A.  Plaintiff Has Adequately Pled that Defendants
       Engaged in Intentional Discrimination. ........................................................ 7

    B.  Plaintiff Has Adequately Pled That Defendants' Actions Had an Impermissible
       Disparate Impact. .......................................................................................... 13

    C.  Plaintiff is an Aggrieved Party Harmed by Defendants. ............................... 18

  II.  Plaintiff Has Stated a Claim for Interference Under 42 U.S.C. § 3617. ........................... 19

  III.  Plaintiff Has Stated a Claim Under Title VI of the Civil Rights Act,
      42 U.S.C.A. § 2000d. ............................................................................................ 20

  IV.  Plaintiff Has Stated a Claim Under the
      Louisiana Equal Housing Opportunity Act ............................................................ 22

  V.  Plaintiff Has Stated a Claim Under 42 U.S.C. § 1983 and the Louisiana Constitution ..... 23

    A.  Plaintiff Has Sufficiently Pled a Violation of its Substantive Due Process Rights ........ 23

    B.  Plaintiff Has Sufficiently Pled a Violation of its Procedural Due Process Rights ......... 26

CONCLUSION ............................................................................................................... 27

# TABLE OF AUTHORITIES

**Cases**                                                                                    Page(s)

*Ave. 6E Invs., LLC v. City of Yuma*,
  818 F.3d 493 (9th Cir. 2016) ................................................................................13, 17, 18

*Ave. 6E Invs., LLC v. City of Yuma*,
  217 F. Supp. 3d 1040 (D. Ariz. 2017) ...................................................................17

*Banks v. McIntosh Cnty., Georgia*,
  No. 2:16-CV-53, 2021 WL 3173597 (S.D. Ga. July 26, 2021)..............................................21

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................................6

*Blackburn v. City of Marshall*,
  42 F.3d 925 (5th Cir. 1995) ...................................................................................24

*Cinel v. Connick*,
  15 F.3d 1338 (5th Cir. 1994) ..................................................................................7

*County Line JV v. City of Grand Prairie*,
  839 F.2d 1142 (5th Cir. 1988) ................................................................................26

*Cox v. Scott Cnty. Sch. Dist.*,
  No. 3:18-CV-677-KHJ-LGI, 2021 WL 1207718 (S.D. Miss. Mar. 30, 2021) .......................20

*Danenhower v. Dorsey*,
  No. CIV. A. 97-390, 1997 WL 469960 (E.D. La. Aug. 12, 1997) ........................................19

*Dews v. Town of Sunnyvale*,
  109 F. Supp. 2d 526 (N.D. Tex. 2000) ....................................................................7, 12

*Esplanade Ridge Civic Assoc. v. City of New Orleans*,
  2013-CA-1062 (La. App. 4 Cir. 2/12/2014), 136 So. 3d 166 ..............................................23

*Four States Realty Co., Inc. v. City of Baton Rouge*,
  309 So. 2d 659, 666 (La. 1974) ..............................................................................13

*Gibson v. Berryhill*,
  411 U.S. 564 (1973)..............................................................................................26

*Greater New Orleans Fair Hous. Action Ctr. v. Kelly*,
  364 F. Supp. 3d 635 (E.D. La. 2019)....................................................................7, 22

*Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*,
  648 F. Supp. 2d 805 (E.D. La. 2009)............................................................... *passim*

*Greater New Orleans Fair Housing Action Center v. St. Bernard Par.*,
   641 F.Supp.2d 563 (E.D. La. 2009) ............................................................................ *passim*

*Groome Res. Ltd., L.L.C. v. Par. of Jefferson*,
   234 F.3d 192 (5th Cir. 2000) ............................................................................................18

*Hallmark Developers, Inc. v. Fulton Cnty.*,
   466 F.3d 1276 (11th Cir. 2006) .......................................................................................16

*Homeowner/Contractor Consultants, Inc. v. Ascension Par. Planning*,
   32 F. Supp. 2d 384 (M.D. La. 1999)................................................................................24

*Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*,
   920 F.3d 890 (5th Cir. 2019) ...........................................................................................14

*Leal v. McHugh*,
   731 F.3d 405 (5th Cir. 2013) .............................................................................................6

*Linkletter v. W. & S. Fin. Grp., Inc.*,
   851 F.3d 632 (6th Cir. 2017) ...........................................................................................20

*Mhany Mgmt., Inc. v. Cty. of Nassau*,
   819 F.3d 581 (2d Cir. 2016).......................................................................................12, 18

*Midwest Feeders, Inc. v. Bank of Franklin*,
   886 F.3d 507 (5th Cir. 2018) .............................................................................................6

*Morgan v. Swanson*,
   659 F.3d 359 (5th Cir. 2011) .........................................................................................6, 11

*N.A.A.C.P. v. City of Kyle*,
   No. A-05-CA-979 LY, 2006 WL 1751767 (W.D. Tex. June 16, 2006)................................16

*Oliver v. Foster*,
   524 F. Supp. 927 (S.D. Tex. 1981) ..................................................................................22

*Paterek v. Vill. of Armada, Mich.*,
   801 F.3d 630 (6th Cir. 2015) ...........................................................................................23

*Renaissance Prop., LLC v. Nationstar Mortg., LLC*,
   No. CV 23-1594, 2023 WL 6037704 (E.D. La. Sept. 15, 2023) ..........................................6

*Revock v. Cowpet Bay W. Condo. Ass'n*,
   853 F.3d 96 (3d Cir. 2017)...............................................................................................20

*Robinson v. City of Baton Rouge*,
   2015 WL 13522820 (M.D. La. Mar. 20, 2015) ....................................................................25

*Rogers v. Lodge,*
    458 U.S. 613 (1982)......................................................................................8

*Russell v. City of Tupelo,*
    544 F. Supp. 3d 741 (N.D. Miss. 2021).....................................................21

*Scott v. Greenville Cnty.,*
    716 F.2d 1409 (4th Cir. 1983) ....................................................................25

*Smith v. Town of Clarkton,*
    682 F.2d 1055 (4th Cir. 1982) ....................................................................12

*Standard Materials, Inc. v. City of Slidell,*
    96-0684 (La. App. 1 Cir. 9/23/97), 700 So. 2d 975....................................24

*Sullivan Properties, Inc. v. City of Winter Springs,*
    899 F. Supp. 587 (M.D. Fla. 1995).............................................................23

*Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.,*
    17 F.4th 950 (9th Cir. 2021) .......................................................................15

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.,*
    576 U.S. 519 (2015)...........................................................................1, 13, 14

*Town of Castle Rock, Colo. v. Gonzales,*
    545 U.S. 748 (2005)....................................................................................24

*United States v. Baylor Univ. Med. Ctr.,*
    736 F.2d 1039 (5th Cir. 1984) ....................................................................21

*United States v. City of Black Jack,*
    508 F.2d 1179 (8th Cir. 1975) ...............................................................19, 20

*United States v. City of New Orleans,*
    No. CIV.A. 12-2011, 2013 WL 1767787, (E.D. La. Apr. 24, 2013)...............16, 17

*United States v. City of New Orleans,*
    No. CIV.A. 12-2011, 2012 WL 6085081 (E.D. La. Dec. 6, 2012)............9, 10, 12

*United States v. City of Parma,*
    494 F. Supp. 1049 (N.D. Ohio 1980), *aff'd*, 661 F.2d 562 (6th Cir. 1981) ............19

*Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977)................................................................... *passim*

*Withrow v. Larkin,*
    421 U.S. 35 (1975).......................................................................................26

**Statutes**

42 U.S.C.A. § 2000d ....................................................................................................21

42 U.S.C. § 3604 ..........................................................................................................6

42 U.S.C. § 1983 ........................................................................................................23

42 U.S.C. § 3601.........................................................................................................22

42 U.S.C. § 3602(i) .....................................................................................................18

42 U.S.C. § 3617 ........................................................................................................19

La. R.S. § 51:2602(a) ..................................................................................................22

Louisiana Equal Housing Opportunity Act, La. R.S. § 51:2601, *et seq*. .......................22

**Other Authorities**

24 C.F.R. § 100.400(c)(2) (2016) ...............................................................................19

24 C.F.R. § 100.500 (2023) ........................................................................................14

Joint Statement of the Dep't of Housing and Urban Dev. and the Dep't of Justice:
*State and Local Land Use Laws and Practices and the Application of the Fair
Housing Act*," Nov. 10, 2016, available at
https://www.justice.gov/opa/file/912366/download. ....................................................6

Plaintiff Stanton Square, LLC ("Plaintiff" or "Stanton Square") has alleged that Defendants City of New Orleans, New Orleans City Council, and Freddie King, III, in his official capacity (collectively "Defendants") unlawfully blocked construction of a multi-family development in Lower Coast Algiers. Plaintiff's Complaint describes how those actions—which have prevented the provision of much-needed affordable housing units to New Orleans residents—violate the Fair Housing Act, Title VI of the Civil Rights Act of 1964, the Louisiana Equal Housing Opportunity Act, and Plaintiff's constitutional due process rights. Plaintiff's allegations are well-supported by credible evidence, and exclusionary zoning claims like Plaintiff's fall squarely within the "heartland" of long-standing fair housing jurisprudence, *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 539-40 (2015). Defendants' arguments ignore entire portions of the Complaint, misconstrue case law, disregard the pleading requirements, and are otherwise unavailing.

## FACTUAL BACKGROUND

In March 2021, Plaintiff purchased property in Lower Coast Algiers, New Orleans, to build a multi-family rental development for New Orleans residents and families.[1] The project, named "The Village at English Turn," was designed to be a residential complex with 278 rental units, consisting of one-, two-, and three-bedroom apartments on 16.8 acres. All of its one- and two-bedroom units would be priced as affordable.[2]

The Village was designed to blend in with the aesthetics of the surrounding area's lower density suburban character. Though regulations would have permitted as many as 35 units per

---

[1] Complaint, Dkt. No. 1 (hereinafter "Compl."), at ¶ 19.
[2] *Id.* at ¶¶ 24-25 (based on HUD's metrics, which link affordability to prices set at 30% or 50% of the region's area median income (AMI) per family/living unit).

acre, The Village was slated to have just 16 units per acre. Its design included amenities such as a swimming pool, clubhouse, and playground to appeal to and serve families with children.[3]

Importantly, the property has been zoned as Suburban Multi-Family Residential (S-RM1) since the 1980s. This designation meant that lower-density multi-family housing is permitted as of right.[4] In a 2016 Fair Housing Assessment report, the City noted that areas zoned S-RM1 are "high opportunity" areas where it is "highly important that zoning laws assist private development of affordable housing to address the overwhelming need."[5]

Consistent with the development's by-right designation, Defendants initially had no objection to the project. Plaintiff's team of architects, engineers, and designers began regular communication with City officials with the Department of Safety and Permits, the City Planning Commission ("CPC"), and the Sewerage and Water Board's administration to ensure that the development was in accord with all applicable regulations, including the City's Comprehensive Zoning Ordinance ("CZO"). Like all residential developments involving over 40,000 square feet of building space, Plaintiff's design had to apply with and undergo review by the CPC's Design Advisory Committee ("DAC") before receiving permits, but no variance would be required.[6]

Within weeks of Plaintiff's application, residents of the surrounding area—in particular a group called the English Turn Property Owners Association ("ETPOA"), linked to a nearby gated community called English Turn—launched a discriminatory campaign in opposition to the development.[7] The ETPOA's campaign was based on stereotypes about who lives in multi-

---

[3] *Id.* at ¶¶ 26-28.
[4] *Id.* at ¶¶ 20-24.
[5] *Id.* at ¶ 15. Due to a word processing error, ¶¶ 1-19 of Plaintiff's Complaint were duplicated. Unless otherwise specified, Plaintiff's references to ¶¶ 1-19 refer to those that begin on page 5 of the Complaint.
[6] *Id.* at ¶¶ 38-41.
[7] *Id.* at ¶¶ 31-32, 43-47.

2

family, affordable housing, challenging what they characterized as an "affront to our lifestyles."[8] The ETPOA turned almost immediately to the City Council for help, sending emails complaining about the would-be development's "high crime rates," influx of disease and other "health concerns," and "deplorable conditions."[9] Approximately 80 English Turn residents attended a DAC meeting meant to consider Plaintiff's design proposal in August 2022. Residents again expressed concern about crime and about how renters taint the area and drive away economic investment; they also expressed concern about the prospective families themselves. The DAC deferred its decision at the end of the meeting, and Plaintiff planned to resubmit its application with additional details.[10] Because Plaintiff's plans were in full compliance with applicable law, including the S-RM1 zoning designation's density and building regulations, Plaintiff expected to secure permits in short order.[11]

Unbeknownst to Plaintiff, as Plaintiff worked through the DAC approval process, the ETPOA worked in close concert with Defendant City Council to introduce a moratorium that was specifically designed to halt construction on The Village.[12] The City Council's initiatives were led by Defendant Councilmember King, who is himself a resident of English Turn.[13]

Although the City Council had previously prioritized the private development of affordable housing in S-RM1 zones in particular,[14] once the City heard the stereotype-coded opposition from the community, it acted immediately to prevent the building of Plaintiff's housing. First, in an October 2022 meeting, it passed an initial motion directing the CPC to

---

[8] *Id.* at ¶ 46.
[9] *Id.* at ¶¶ 45-56; *see also* ¶ 100; *infra* n. 38 (quoting stereotype-laden statements made by community members in opposing The Village).
[10] Compl., at ¶¶ 47-49.
[11] *Id.* at ¶ 22.
[12] *Id.* at ¶¶ 50-51.
[13] *Id.* at ¶ 19.
[14] *Id.* at ¶ 15.

consider whether to enact an interim zoning district ("IZD") ordinance to temporarily prohibit the development of multi-family housing on property (like Plaintiff's) zoned S-RM1 in Lower Coast Algiers and to require additional impact studies. Defendants did not provide Plaintiff with notice of the October 2022 meeting, which had immediately halted Plaintiff's project.[15]

In December 2022, the CPC held a meeting and unanimously voted to reject the Council's IZD proposal. The CPC's Executive Director had determined that The Village in fact met each of the six review standards. It also found that the development's goals were in full compliance with the City's Master Plan, which had noted that the City needed 35,000 units to meet demand, and that promoting affordable housing choice was one of the City's top priorities. It found no need for additional impact studies.[16]

The City Council held a second meeting in February 2023. At the end of this meeting, the City Council voted to overrule the CPC's decision and maintain the IZD. In doing so, the City had rejected the analysis of the CPC, the municipal body whose executive director is charged with reviewing the project's adherence to the City's approval standards. The only reasoning the City offered for overruling the CPC's decision was that it was "deemed necessary and in the best interest of the City of New Orleans."[17]

As a rental development with affordable rates and over 150 units with two- and three-bedrooms, The Village would have significantly relieved New Orleans' housing crisis. The Village's housing would have been of particular benefit to the City's racial minorities and families with children. African Americans are disproportionately represented in the City's rental pool (60% of City's renters, as opposed to 48% of City's homeowners). African Americans and

---

[15] *Id.* at ¶¶ 52-56.
[16] *Id.* at ¶¶ 61-67; *see also id.* at ¶¶ 22, 25-26 (development was in full compliance with applicable zoning designation and building regulations), 58-69, 84-90 (reasons why IZD was pretextual).
[17] *Id.* at ¶¶ 68-78, 81-83.

Hispanics make up more than 83% of the people living below the poverty level, and thus more likely to be renters than homeowners, in New Orleans. A disproportionate percentage of families with children (over 30% percent) in New Orleans live below the poverty level, as well.[18]

The Village would have also helped to dismantle long-standing segregation in Lower Coast Algiers. The census block group in which The Village was slated to be built is 32.8% African American and Hispanic. It abuts Plaquemines Parish, which is overwhelmingly white: its population is just 0.5% African American and Hispanic. The multi-family developments in and surrounding the Triangle, the area on the other side of the Intracoastal Canal from Lower Coast Algiers closest to English Turn, are either at or near capacity. There are no multi-family developments currently on Lower Coast Algiers.[19]

Instead, Defendants' efforts have delayed—perhaps permanently—the building of The Village. Were it not for the City's actions, The Village was slated to begin opening in phases in December 2023, with full availability by June 2024.[20] As a result of the IZD, Plaintiff cannot seek necessary permits, and it cannot start construction until those permits have been obtained. Defendants have also submitted, at the behest of the ETPOA, an application to change all S-RM1-designated properties in the region to be suburban single-family or rural residential estate. If the application passes, Defendants are on track to permanently block Plaintiff's development.[21]

The ETPOA has, meanwhile, celebrated the situation as a major victory. It noted that its legal team had "worked closely with the office of . . . Councilmember Freddie King," and that it

---

[18] Id. at ¶¶ 92-94 (citing statistics on populations with household incomes under AMI).
[19] Id. at ¶¶ 4-5; see also id. at ¶¶ 31-37.
[20] Id. at ¶ 1 on Compl. p. 1; ¶ 7 on Compl. p. 1; ¶ 30.
[21] Id. at ¶¶ 82, 97-98, 112-115.

was "grateful to all who, determined to protect our community, undertook an effort given little chance of success."[22]

**LEGAL ARGUMENT**

In reviewing a Rule 12(b)(6) motion, the Court must "accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiff." *Midwest Feeders, Inc. v. Bank of Franklin*, 886 F.3d 507, 513 (5th Cir. 2018). The complaint must "state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Factual disputes are inappropriate for resolution on a motion to dismiss, and a court may consider only those factual allegations contained in the pleadings. *See Morgan v. Swanson*, 659 F.3d 359, 401 (5th Cir. 2011). The Fifth Circuit has recognized that motions to dismiss under Rule 12(b) are "generally viewed with disfavor." *See, e.g., Renaissance Prop., LLC v. Nationstar Mortg., LLC*, No. CV 23-1594, 2023 WL 6037704, at *3 (E.D. La. Sept. 15, 2023); *see also Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013).

## I.   Plaintiff Has Stated a Claim for Discrimination Under 42 U.S.C. § 3604.

Plaintiff's Complaint alleges that Defendants' actions violate the Fair Housing Act ("FHA"), 42. U.S.C. § 3604, *et. seq.,* because they were motivated by race and familial status (*infra* Section I.A); they will have a disproportionate adverse impact based on race and familial status (*infra* Section I.B); and they will perpetuate existing patterns of racial segregation in Lower Coast Algiers. It is well-accepted that exclusionary zoning cases are cognizable under the FHA.[23] Here, the actions Defendants took to block Plaintiff's multi-family development mirror

---

[22] *Id.* at ¶ 57.
[23] *See generally* "Joint Statement of the Dep't of Housing and Urban Dev. and the Dep't of Justice: *State and Local Land Use Laws and Practices and the Application of the Fair Housing Act*," Nov. 10, 2016, available at https://www.justice.gov/opa/file/912366/download.

those that courts have found to violate the FHA. Defendants' arguments with respect to disparate

impact, intentional discrimination, and injury (*infra* Section I.C) are meritless.

Defendants' Motion does not address Plaintiff's well-pled perpetuation of segregation

claim,[24] and thus the argument is waived. *See Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir.

1994). Perpetuation of segregation is a distinct theory of liability under the FHA. *See Dews v.

Town of Sunnyvale*, 109 F. Supp. 2d 526, 564 (N.D. Tex. 2000). Plaintiff's case will therefore

proceed to discovery regardless of how the Court resolves the pending Motion.

A. <u>Plaintiff Has Adequately Pled that Defendants Engaged in Intentional Discrimination.</u>

Plaintiff's Complaint sufficiently alleges that Defendants acted with discriminatory intent

in blocking the development of The Village. To survive a motion to dismiss, a plaintiff need only

allege facts that indicate that a protected trait was "one significant factor" in the defendant's

dealings to present a plausible claim of disparate treatment. *Greater New Orleans Fair Hous.

Action Ctr. v. Kelly*, 364 F. Supp. 3d 635, 650 (E.D. La. 2019). The Supreme Court has identified

at least six factors that are instructive to assessing whether discriminatory intent motivated a

zoning decision: (1) historical background of the challenged decision, (2) the specific sequence

of events leading up to the challenged decision; (3) departures from normal procedural sequence;

(4) substantive departures; (5) legislative history; and (6) disproportionate impact. *See Vill. Of

Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-67 (1977). Plaintiff's

Complaint amassed a wealth of circumstantial evidence supporting its claim that the City's

actions were significantly motivated by discriminatory opposition to the race and familial status

of the prospective residents of Plaintiff's multi-family development.

---

[24] *See, e.g.*, Compl., p.3 at ¶¶ 10; *see also* ¶¶ 95-96, 118, 128.

First, the complaint alleges a historical background of discrimination, carried out by the City of New Orleans. Evidence of historical discrimination, segregation, and displacement are relevant in finding purposeful discrimination, especially where it is the same actor carrying out the actions. *See Rogers v. Lodge*, 458 U.S. 613, 625-26 (1982) (explaining the ways in which "[e]vidence of historical discrimination is relevant to drawing an inference of purposeful discrimination," particularly where the evidence shows past discrimination and the governmental body has been "unresponsive and insensitive to the needs of the black community."). Historical background is particularly useful where "it reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267.

Here, the Complaint begins with descriptions of how Defendants have—despite being on notice of their residents' need for housing opportunities—routinely taken actions that reduce housing stock traditionally occupied by African Americans and Hispanics.[25] The Complaint also describes the City's own reports admitting the effect of neighborhood associations lobbying the City Council for the use of restrictive zoning measures.[26] It notes a lawsuit filed by the U.S. Department of Justice against the City for engaging in similar discriminatory zoning practices.[27] Taken together, these allegations sufficiently state an invidious pattern of efforts undertaken by Defendants to block affordable, integrated housing and to discriminatorily limit housing opportunities for African Americans, Hispanics, and families with children.

Second, the specific sequence of events leading to the City's enactment of the IZD also point to discriminatory intent. *See Arlington Heights*, 429 U.S. at 267. Since the 1980s, the City

---

[25] *Id.* at ¶¶ 8-9 (Defendants have admitted that there is a need for affordable housing); ¶¶ 11-12 (City Council's historical decisions to eliminate social housing and implementing restrictive policies).

[26] *Id.* at ¶¶ 14-15 (the City and the Housing Authority explicitly describe neighborhood associations as a "factor[] that significantly create[s], contribute[s] to, perpetuate[s]" segregation, and that their lobbying has limited city efforts towards integration).

[27] *Id.* at ¶ 13.

had zoned the area at issue for multi-family housing.[28] The City initially had no objection to the particular project, and reversed course only after community members expressed discriminatory opposition to the development.[29] *See United States v. City of New Orleans*, No. CIV.A. 12-2011, 2012 WL 6085081, at *9 (E.D. La. Dec. 6, 2012) (denying motion to dismiss, finding that discriminatory denial of zoning variance application because of "community opposition expressed at the hearings" met *Arlington Heights* factors). In fact, prior to the public outrage, the City had called out this location as one where it was "highly important that zoning laws assist private development of affordable housing to address the overwhelming need [for housing]."[30] That this support "immediately eroded" after the community began to oppose the project is circumstantial evidence of discriminatory intent. *Greater New Orleans Fair Housing Action Center v. St. Bernard Par.*, 641 F.Supp.2d 563, 573 (E.D. La. 2009)) ("*St. Bernard Parish I*").

The third *Arlington Heights* factor is departure from ordinary procedures, and the fourth is substantive departure from ordinary procedures. *Arlington Heights*, 429 U.S. at 267. Courts find evidence of the third factor when an apparently routine process is, without justification, delayed or denied. *See Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*, 648 F. Supp. 2d 805, 813 (E.D. La. 2009) ("*St. Bernard Parish II*") (finding departure from normal procedural sequence where applications were on track for approval, then suddenly derailed without justification). And when a city government that regularly relies on the recommendations of its experts suddenly defies them, that can evince a departure from norms. *Id*. Substantive departures exist when "factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *St. Bernard Parish I*, 641 F. Supp. 2d at 574.

---

[28] *Id.* at ¶¶ 20-25 (Plaintiff's lot had been zoned S-RM1 for more than forty years).
[29] *Id.* at ¶¶ 38-43 (City and Plaintiff were working through process amicably, and only after ETPOA's vocal opposition did City reverse course on decades of zoning).
[30] *Id.* at ¶ 15.

The City Council's rejection of the CPC's recommendation against the IZD is a significant departure, both procedurally and substantively. The CPC, consisting of 9 members appointed by the Mayor and subject to approval by the City Council, routinely makes recommendations to the City on whether to adopt IZDs and make modifications.[31] Here, the CPC voted unanimously to deny the IZD request—with some commissioners stating that the IZD "went against the intent of the Master Plan" and other expressing incredulity that it was even proposed.[32] The City Council, however, overruled the CPC's recommendation. It did so even though, as the CPC had noted, each of the calls for further studies were already incorporated into the design review and permitting process and were found to have been sufficiently satisfied by Plaintiff.[33] As a result, even though the CPC found each of the six substantive criteria met, Plaintiff still does not have a permit. Courts have found that, where the municipality "acted against its own recommendation" in making a zoning decision and "provided no explanation" for it, the third and fourth *Arlington Heights* factors are met. *U.S. v. City of New Orleans*, 2012 WL 6085081 at *9. Here, no councilmember offered any reasoning on the record regarding their vote; in fact, the only written reason ever provided was that the IZD was somehow "deemed necessary and in the best interest of the City of New Orleans."[34] Still other departures include the IZD's requirement of additional, pretextual studies, and the last-minute deletion of a new appeal procedure that would have set less discretionary standards for Plaintiff to meet in order to proceed with the development process.[35]

---

[31] *Id.* at ¶ 61.

[32] *Id.* at ¶¶ 62-67, 80 (according to public watchdog organization, it is "exceedingly rare" for City Council to overrule CPC's recommendation).

[33] *Id.* at ¶¶ 84-90 (describing how studies sought in IZD were adequately addressed by normal processes, and how concerns should equally apply to single-family developments that are not reached by IZD).

[34] *Id.* ¶¶ 68-78.

[35] *Id.* at ¶¶ 71-72 (deletion of new appeal procedure), 84-91 (regular permitting process already requires same set of studies to be undertaken).

<u>Fifth</u>, courts have found that legislative history is "highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Arlington Heights*, 429 U.S. at 268. Here, the legislative history indicates how Councilmember King recused himself from the initial IZD vote, presumably because he believed he had a conflict of interest in the IZD, only to later reverse course and actually sponsor the final IZD.[36] As discussed earlier, the Complaint alleges that the record is also noticeably devoid of official comment around the decision and that the racially-coded public outcry played a role in Defendants' decision to keep quiet. *See St. Bernard Parish I*, 641 F. Supp. 2d at 576-77.

<u>Sixth</u>, as discussed *infra* Section II, Defendants' actions have a disproportionate impact, in that they bear "more heavily on one race [or protected class] than another." *Arlington Heights*, 429 U.S. at 266.

In sum, Plaintiff has plausibly alleged all of the factors set forth in *Arlington Heights*. Defendants do not engage with any of this. Instead, they focus on portions of the Complaint that they claim support their position that they were motivated by non-discriminatory reasons (infrastructure, public services, and the like), all the while ignoring the Complaint's allegations as to why those reasons were pretextual.[37] Defendants' Mem. in Support of Mot. to Dismiss, Dkt. No. 14-1, at 12 ("Def. Br."). Defendants' speculation about the City's motives cannot be credited at this stage of litigation, and Plaintiff is entitled to discovery on this topic. *See Morgan v. Swanson*, 659 F.3d at 401.

Next, Defendants contend that the Complaint does not demonstrate evidence of discriminatory intent, because Defendants merely allowed "all affected parties a fair opportunity to be heard" and cannot be held "at fault [for] listening to the concerns of citizens and residents."

---

[36] *Id.* at ¶¶ 55-56, 72, 76.
[37] *Id.* at ¶¶ 83-91.

Def. Br. at 13. But the Complaint does not merely allege that Defendants allowed the community to be heard: it alleges that Defendants ceded to the community's discriminatory opposition.

It is well-understood that a municipality violates the FHA when it caves to community opposition motivated by discriminatory animus. *See, e.g.*, *City of New Orleans*, 2012 WL 6085081, at *9 (noting that "a city may be liable for responding to public opposition"); *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 608 (2d Cir. 2016) (affirming district court decision in favor of plaintiffs in part due to the city officials' "capitulation to citizen fears of affordable housing, which reflected race-based animus"); *Dews v. Town of Sunnyvale*, 109 F. Supp. 2d at 572. And, indeed, the Complaint alleges just that: it includes statement after statement made by community members to City officials about The Village's prospective residents, referencing high crime rates, health problems, deplorable conditions, and other racially coded language.[38] *See St. Bernard Parish I*, 641 F. Supp. 2d at 571–72 (references to "ghetto," "crime," "blight," "slum-like conditions," and "shared values" are racially loaded and evidence of discriminatory intent); *Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982) (affirming that statements about "undesirables" and concerns about personal safety due to "new" people are "camouflaged racial expressions"). The Complaint also alleges that the City responded to these discriminatory concerns, working closely with the ETPOA in formulating the IZD.[39] The Complaint thus clearly

---

[38] *Id.* at ¶¶ 46-47. For example, the residents communicated to City officials that "this development is an affront to our lifestyles," and urged that the City "protect what we value most." *Id.* The statements included numerous references to discriminatory stereotypes of the prospective residents of The Village, and not zoning-related concerns. *See id.* at ¶ 100 (community members stated, *inter alia*, affordable housing "creates crime because people don't know how to govern themselves;" "Get off you're [sic] a** and work harder if you wanna live back here in English Turn;" and "The school is overran with people who bring the same mentality of violence from New Orleans to outlining areas.").

[39] *Id.* at ¶ 3 at Compl. p. 2, ¶ 8 at Compl. p. 3, ¶¶ 50-52, 57 (publicly-posted newsletters noted that ETPOA's legal team "worked closely with the office of Councilmember King"), ¶ 79 (other councilmembers agreed to vote in accord with Councilmember King), ¶ 99 (Councilmember King continues to encourage POA's actions).

and sufficiently pleads that, far from being an recalcitrant listener, the City enacted the IZD because of the discriminatory concerns of its residents.

Two cases cited in Defendants' brief actually support Plaintiff's position. In *Ave. 6E Invs., LLC v. City of Yuma*, the plaintiffs alleged that the city violated the FHA when it attempted to rezone property against the recommendation of their planning commission and in response to racist backlash. 818 F.3d 493, 508 (9th Cir. 2016). The Ninth Circuit held that the Complaint adequately pled disparate treatment. *Id*. Similarly, in *Four States Realty Co., Inc. v. City of Baton Rouge*, the plaintiff challenged the city's rezoning of three lots which had been zoned for business use for more than twenty-five years. 309 So. 2d 659, 666 (La. 1974). The city's actions were in contravention of the city's long-term comprehensive zoning plan and against the recommendation of the planning commission, and the Supreme Court found that the city's decision was arbitrary, capricious, and unconstitutional. *Id*. at 673-74. As both cases make clear, municipalities cannot escape liability by arguing that it acted in response to citizen concerns, especially where, as here, those concerns rest on discriminatory stereotypes. Because Plaintiff has adequately pled a discriminatory motive, Defendants' Motion must be denied.

  B.  <u>Plaintiff Has Adequately Pled That Defendants' Actions Had an Impermissible Disparate Impact.</u>

The Complaint also contains well-supported allegations that Defendants' IZD violates the FHA because it had a disproportionate adverse impact because of race and familial status.

In contrast to disparate treatment claims, which focus on the intent of the decisionmaker, disparate impact challenges involve neutral policies and practices that have a disproportionately adverse effect on a protected class and are otherwise unjustified by a legitimate rationale. *Inclusive Communities Project*, 576 U.S. at 524. "A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases,

13

reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.500 (2023). The neutral policy or practice, and not some other factor or policy, has to have caused disproportionate effect; this is sometimes referred to as "robust causality." *See Inclusive Communities Project*, 576 U.S. at 543 (giving examples of alternative causal factors that fail to meet robust causality standard).

In exclusionary zoning cases, disparate impact is a well-accepted tool used to address discriminatory municipal actions. In his majority opinion in *Inclusive Communities Project*, Justice Kennedy identified exclusionary zoning cases as "resid[ing] at the heartland of disparate-impact liability." 576 U.S. at 521 (citing numerous cases involving municipal bars to the development of multifamily and/or rental housing, including *St. Bernard Parish I*, 641 F.Supp.2d at 569, 577–578.). And as the Fifth Circuit described, disparate impact is utilized in zoning cases "to remove indefensible government policies that operated to perpetuate segregation by unreasonably restricting private construction of multi-family housing that would increase affordable housing options for minorities." *Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 908 (5th Cir. 2019).

Plaintiff's Complaint fits squarely within the Supreme Court and Fifth Circuit's exclusionary zoning jurisprudence. First, Plaintiff pled that Defendants enacted a neutral policy or practice in the form of the IZD, a facially neutral zoning ordinance that temporarily prohibited the development of any multi-family housing in the district.[40]

Second, Plaintiff pled that this policy had a disproportionately adverse effect on African Americans, Hispanics, and families with children. The Complaint alleges that the renter population of New Orleans is disproportionately African American (60%) as compared to

---

[40] *Id.* at ¶ 53.

homeowners (48%).[41] The Village would have made over 250 rental units available to New

Orleans renters; conversely, as a result of Defendants' enacting the IZD, the only housing that

could still be built on the lot are single-family homes, which are more likely to be occupied by

homeowners. Thus, African Americans are likely to be disproportionately adversely impacted by

Defendants' IZD. The Complaint also alleges that the percentage of the New Orleans population

living under the poverty level is disproportionately African American and Hispanic (83%, as

compared to whites who make up 15%), and disproportionately comprised of families with

children (30%, as compared to families generally who make up 18.9%).[42] Because people who

live below the poverty level are more likely to be renters than the homeowners, they are likely to

be disproportionately adversely impacted by Defendants' IZD. This is especially the case where,

as alleged in the Complaint, a significant portion of the rental units were priced to be affordable

according to HUD's metrics.[43]

Third, Plaintiff has pled robust causation. Because the IZD's prohibition on building

multi-family housing covered the area in which Plaintiff's development was to be built,

Defendants' neutral policy or practice prevented Plaintiff from building those units. In other

words, the sole cause of Plaintiff's inability to build was Defendants' decision to implement the

IZD; this more than meets the robust causality standard. *See Sw. Fair Hous. Council, Inc. v.*

*Maricopa Domestic Water Improvement Dist.*, 17 F.4th 950, 965–66 (9th Cir. 2021) ("[I]t is not

the case that we are left wondering whether members of a protected class are subject to the

increased fee because of this policy or because of some other factor. . . . [Because] the sole cause

---

[41] *Id.* at ¶ 92.
[42] *Id.* at ¶¶ 93-94.
[43] *Id.* at ¶ 24.

of the disproportionate impact of the increased security deposit was the District's decision to apply the policy only to a subset of its customers[,] Appellants established robust causation.").

Plaintiff's complaint has sufficiently pled a disparate impact cause of action, and Defendants' arguments to the contrary fail.

First, Defendants quibble with the demographic boundaries Plaintiff draws. Def. Br. at 10-11. "No single test controls in measuring disparate impact," *Hallmark Developers, Inc. v. Fulton Cnty.*, 466 F.3d 1276, 1286 (11th Cir. 2006), but in any event, Plaintiff's Complaint identifies the right boundaries: it describes the demographics of the census block group (Census Block Group 1 of Census Tract 612) that includes Plaintiff's property and the entire area affected by the IZD.[44] Defendants dispute Plaintiff's geographic boundary selection, claiming instead that the only "legitimate" boundary would have been Lower Coast Algiers. Def. Br. at 11. Defendants cite no case law for this proposition, and courts in this Circuit have rejected this exact argument. *See, e.g.*, *N.A.A.C.P. v. City of Kyle*, No. A-05-CA-979 LY, 2006 WL 1751767, at *4 (W.D. Tex. June 16, 2006).

Relatedly, Defendants argue that the Complaint must be dismissed because it does not identify a pool of renters who could afford to rent the property.[45] Def. Br. at 10-11. As described above, this is irrelevant: Plaintiff's Complaint relies on statistics about the rental population of

---

[44] *Id.* at ¶ 5, and immediately preceding map. This map depicts all census block groups in the region, including those from which the rental pool is likely to draw. The subject property is located in Census Block Group 1 of Census Tract 612. Plaintiff's Complaint refers to this census block group as "English Turn," but in reality this census block group includes all S-RM1 zones—in other words the entire area impacted by the IZD.

[45] Defendants also attempt to cast Plaintiff's allegations regarding the affordability of the units as "conclusory." Def. Br. at 11. In doing so, they ignore the Complaint's reference to the number of rental units (278)—including the number of one-bedroom units (104), two-bedroom units (126), and three-bedroom units (48). They also ignore Plaintiff's well-pled allegation that, of those units, all of the one- and two-bedroom units would be priced as affordable based on HUD's current metrics. Compl. at ¶ 24. *Cf. United States v. City of New Orleans*, 2013 WL 1767787, at *7 (motion to dismiss denied where half of the project's units was dedicated to housing eligible for people with disabilities).

New Orleans and how it is disproportionately African American as compared to the homeowner population. This rental population includes those who need affordable housing and those who do not; in other words, the Court does not have to resolve the affordability issue to find a properly-pled cause of action. Defendants' argument is also wrong. First, it assumes a housing market that is based entirely on private income, and not, for example, government subsidies that are provided to individuals and families for housing-related expenses. Moreover, it ignores the standard at the Rule 12 stage. Defendants point to *Ave. 6E Invs., LLC v. City of Yuma*, 217 F. Supp. 3d 1040 (D. Ariz. 2017), a decision on summary judgment holding that the use of expert statistical analysis regarding the pool of qualified home buyers was sufficient to defeat the city's Rule 56 motion. At the Rule 12 stage, however, the Ninth Circuit relied solely on statistics from the City's General Plan and the U.S. Census to find that the plaintiff had adequately pled disparate impact. *See Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d at 508.

Plaintiff's Complaint relied on identical sources as the plaintiff in *Avenue 6E*, and goes as far to as to drill down to the pool of prospective residents in the New Orleans area.[46] Indeed, courts in this district have regularly endorsed similar (and even less specific) analyses at the pleading stage. *See, e.g.*, *United States v. City of New Orleans*, No. CIV.A. 12-2011, 2013 WL 1767787, at *7 (E.D. La. Apr. 24, 2013) (allegations that moratorium on certain financing for low-income housing had a disparate impact on people with disabilities, because 55% of the "local homeless population" is disabled, was sufficient at motion to dismiss stage); *St. Bernard Parish I*, 641 F. Supp. 2d at 567 (disparate impact was established in part through a finding that "African-American households are twice as likely as Caucasians to live in rental housing"); *see*

---

[46] Compl., at ¶¶ 8-9 (referencing City's Master Plan), ¶¶ 92-94 (referencing American Community Survey statistics); *see also id.* at ¶ 37 (The Village will most likely draw its renter pool from areas just north of the Intracoastal Waterway, which are disproportionately African American and Hispanic).

*also Mhany*, 819 F.3d at 620. All these cases make clear that Defendants' arguments set the bar too high, and that Plaintiff's disparate impact allegations are more than sufficient to survive a motion to dismiss.

    C.  <u>Plaintiff is an Aggrieved Party Harmed by Defendants.</u>

    Defendants erroneously argue that the Complaint fails to identify any aggrieved person harmed by Defendants' actions. Def. Br. at 13. Not so: Plaintiff is the aggrieved party. *See* 42 U.S.C. § 3602(i) (defining "aggrieved person" to include any person who "either claims to have been injured by a discriminatory housing practice" or "believes that such person will be injured by a discriminatory housing practice that is about to occur"); *see also Arlington Heights*, 429 U.S. at 261 (real estate developer can be aggrieved person); *Ave. 6E*, 818 F.3d at 496 (same).

    Moreover, Plaintiff has made specific allegations of injury directly traceable to the Defendants' actions. Plaintiff alleges that the IZD and denial of Plaintiff's appeal constitute a "constructive denial" of Plaintiff's development application and that the significant resources it has expended to date will be wasted if the development remains as it is, in serious jeopardy.[47] Plaintiff also alleges that Defendants' actions caused significant delay to a project that otherwise would have been slated to begin opening in phases in December 2023."[48] This is more than enough to substantiate Plaintiff's injury, as case law clearly demonstrates that delays caused by moratoria may violate the FHA. *See Groome Res. Ltd., L.L.C. v. Par. of Jefferson*, 234 F.3d 192, 200 (5th Cir. 2000) ("[I]ndeterminate delay [has] the same effect of undermining the anti-discriminatory purpose of the [Fair Housing Act]."); *see also St. Bernard Parish I*, 641 F. Supp. 2d at 578–579 (12-month temporary halt on multi-family housing establishes FHA violation).

---

[47] *Id.* at ¶¶ 108-22; *see also* ¶¶ 24-28, 38-42, 58-60 (describing efforts Plaintiff has invested into project).
[48] *Id.* at ¶¶ 30, 113.

Defendants first claim that the Complaint does not contain "enough facts" regarding Plaintiff's injuries to establish that it was aggrieved by Defendants' actions. Def. Br. at 13. They cite to *Danenhower v. Dorsey*, which is easily distinguishable because that plaintiff's complaint made no allegation whatsoever about possible injury. No. CIV. A. 97-390, 1997 WL 469960, at *4 (E.D. La. Aug. 12, 1997) (no allegation regarding emotional distress, lost wages, or out-of-pocket damages). Here, Plaintiff has adequately alleged out-of-pocket damages and lost rental profit. Defendants next argue, without authority, that because Plaintiff had not yet secured permits, there was no harm. There is no legal basis for this claim: courts regularly find FHA violations even if plaintiffs' developments had not yet broken ground. *See, e.g., Arlington Heights*, 429 U.S. at 261-62 ("When a project is as detailed and specific as Lincoln Green, a court is not required to engage in undue speculation as a predicate for finding that the plaintiff has the requisite personal stake in the controversy."); *St. Bernard Parish II*, 648 F. Supp. 2d at 808. Because Plaintiff cannot move forward in the permitting process due to the IZD it alleges was enacted discriminatorily, Defendants' arguments must fail.

## II.     Plaintiff Has Stated a Claim for Interference Under 42 U.S.C. § 3617.

Plaintiff has sufficiently pled a claim of unlawful interference in violation of the FHA. 42 U.S.C. § 3617 prohibits "interfer[ence] with any person in the exercise or enjoyment of . . . any right granted or protected by" the FHA. 42 U.S.C. § 3617; *see also* 24 C.F.R. § 100.400(c)(2) (2016). In the municipal zoning context, it is unlawful for a municipality to interfere with the construction of housing because of the race or familial status of the prospective residents. *See, e.g.*, *United States v. City of Black Jack,* 508 F.2d 1179 (8th Cir. 1975); *United States v. City of Parma*, 494 F. Supp. 1049, 1100 (N.D. Ohio 1980), *aff'd*, 661 F.2d 562 (6th Cir. 1981).

A plaintiff may show interference by showing that (1) the plaintiff exercised or enjoyed a right guaranteed by §§ 3603–3606; (2) the defendant's conduct constituted interference; and (3)

19

a causal connection between the exercise or enjoyment of a right and the defendant's conduct. *See Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 112–13 (3d Cir. 2017). Here, the Complaint establishes all three elements. Plaintiff exercised a right to use and construct housing—in particular multi-family, affordable housing which would have provided rental opportunities for significant numbers of African Americans, Hispanics, and families with children—a right protected by § 3604. By enacting the IZD and blocking the construction, Defendants' conduct interfered with this right. Plaintiff has alleged that Defendants' decision to enact the IZD was taken in direct response to Plaintiff's attempt to build multi-family housing.

Defendants' arguments to the contrary lack merit. The case law is clear that Defendants' prohibition on the construction of housing constitutes interference under § 3617. *See Black Jack*, 508 F.2d at 1182 (zoning ordinance that prohibited construction of multi-family dwelling "interferes with the exercise of the right to equal housing opportunity"); *see also Linkletter v. W. & S. Fin. Grp., Inc.*, 851 F.3d 632, 638 (6th Cir. 2017) ("the language 'interfere with' should be broadly interpreted to reach all practices which have the effect of interfering with housing rights."). And, for the reasons described *supra* Section I, Plaintiff has alleged sufficient facts to support its claim that Defendants violated § 3604.

## III. Plaintiff Has Stated a Claim Under Title VI of the Civil Rights Act, 42 U.S.C.A. § 2000d.

Plaintiff's claim against Defendant City of New Orleans[49] under Title VI of the Civil Rights Act is also sufficiently pled. Under Title VI, "[n]o person in the United States shall, on the ground of race, color, or national origin, be . . . subjected to discrimination under any

---

[49] Plaintiff does not object to Defendants' request to dismiss the Title VI claim against Councilmember King in his official capacity. *See Cox v. Scott Cnty. Sch. Dist.*, No. 3:18-CV-677-KHJ-LGI, 2021 WL 1207718, at *5 (S.D. Miss. Mar. 30, 2021) (in Title VI context, an official capacity suit is duplicative of a suit against government entity). Plaintiff also does not object to dismissing the Fourth Cause of Action in Plaintiff's Complaint as duplicative of the Third Cause of Action, as both allege a Title VI violation.

program or activity receiving Federal financial assistance." 42 U.S.C.A. § 2000d. To establish a

Title VI claim, Plaintiff must allege "(1) that there is race [] discrimination, and (2) that the

entity engaged in discrimination is receiving federal financial assistance." *Russell v. City of*

*Tupelo*, 544 F. Supp. 3d 741, 762 (N.D. Miss. 2021), *reconsideration granted on other grounds*,

No. 1:20-CV-3-SA-DAS, 2021 WL 4979005 (N.D. Miss. Oct. 26, 2021).

Plaintiff's Complaint meets both requirements. As discussed *supra* Section I.A, Plaintiff

has alleged that Defendants, motivated by discrimination intent, enacted the IZD to delay and

block Plaintiff's multi-family housing development. *See Russell*, 544 F. Supp. 3d at 762 ("The

burden of proof in a Title VI case is the same as that for . . . other civil rights statutes."). This

discrimination was carried out by the City, a recipient of Federal financial assistance.[50]

Defendants' arguments are unavailing. First, Defendants appear to argue that Title VI

only prohibits discrimination in the particular program for which the government recipient

received funding. Not so. Title VI has the broad aim of rooting out discrimination, even if the

specific federal funding received is not used for discrimination. *See, e.g., Banks v. McIntosh*

*Cnty., Georgia*, No. 2:16-CV-53, 2021 WL 3173597, at *7 (S.D. Ga. July 26, 2021) (noting that

Title VI is designed "to prohibit a government entity from discriminating if part of that entity

received funds, regardless of whether those funds were specifically used for discrimination").

The proper inquiry is not whether a covered *beneficiary* will be a resident at Plaintiff's proposed

development, or whether Plaintiff's development will be part of a federal program, but rather

whether the City, as a *recipient* of federal funds, is discriminating on the basis of race. *Cf. United*

*States v. Baylor Univ. Med. Ctr.*, 736 F.2d 1039, 1044 n.10 (5th Cir. 1984) ("The requirements

of Title VI cover recipients but not beneficiaries.").

---

[50] Compl., at ¶ 140 (City of New Orleans receives federal Community Development Block Grants); *see also* ¶¶ 10-11 (describing City's resultant housing-related obligations).

Second, Defendants argue that because the land was undeveloped, their actions did not technically "reduce[] the stock of available housing." Def. Br. at 16. The case law does not distinguish between existing housing that is demolished and planned housing that was prevented from being built. Plaintiff has adequately descried how, but for Defendants' actions, it was slated to have available units as early as this year.[51] Where, as here, Plaintiff's Complaint refers to demographic data to show that this particular development would increase housing stock and opportunities to minorities, that is more than enough.

### IV.    Plaintiff Has Stated a Claim Under the Louisiana Equal Housing Opportunity Act.

Plaintiff has sufficiently pled a claim for relief under the Louisiana Equal Housing Opportunity Act ("LEHOA"), La. R.S. § 51:2601, *et seq*. As Defendants correctly point out, the LEHOA is substantially equivalent to the FHA. Def. Br. at 17. Both establish that all persons should be allowed to obtain housing regardless of race, sex, color, religion, handicap, familial status, or national origin. *See* La. R.S. § 51:2602(a); 42 U.S.C. § 3601, *et seq.* As set forth *supra* Sections I and II, the Complaint sufficiently states claims for relief under the FHA and, therefore, it does under the virtually identical LEHOA, as well. *See Kelly*, 364 F. Supp. at 648 n.90.

Defendants' arguments are unavailing. First, the fact that Plaintiff dismissed its state court action for limited judicial review of the IZD without prejudice is irrelevant to the instant proceedings, as Plaintiff was not required to have brought a state court action in the first instance. *See, e.g.*, *Oliver v. Foster*, 524 F. Supp. 927, 929 (S.D. Tex. 1981) (no exhaustion requirement prior to the filing of a civil action in federal court). Next, Defendants cite to Louisiana case law regarding a presumption of validity that attaches to zoning decisions. Def. Br. at 18. It is axiomatic that zoning decisions can enjoy a presumption of validity yet still violate

---

[51] *Id.* at ¶ 30.

22

specific laws that prohibit, for example, discriminatory housing and zoning practices, as defined under the LEHOA and FHA. *See, e.g.*, *Esplanade Ridge Civic Assoc. v. City of New Orleans*, 2013-CA-1062 (La. App. 4 Cir. 2/12/2014), 136 So. 3d 166, 169 (holding that although a decision of the BZA is afforded a presumption of validity, that decision is nevertheless subject to FHA). Finally, *Sullivan Properties, Inc. v. City of Winter Springs*, 899 F. Supp. 587, 595 (M.D. Fla. 1995), asks whether Eleventh Circuit law requires substantive due process claims to be pled under the state Constitution, as opposed to the federal, and has no bearing on the LEHOA, a statutory claim. Defendants' Motion must be denied.

**V.   Plaintiff Has Stated a Claim Under 42 U.S.C. § 1983 and the Louisiana Constitution.**

Plaintiff's Complaint alleges that Defendants' actions violate its constitutional right to due process, in violation of 42 U.S.C. § 1983 and the Louisiana Constitution. Plaintiff has sufficiently pled that it has a constitutionally protected property interest, which Defendants deprived through arbitrary and capricious action (a violation of its substantive due process rights); and that its procedural due process rights were deprived through Defendants' biased and procedurally faulty decisions. Defendants' arguments misstate the law and must be rejected.

A.   Plaintiff Has Sufficiently Pled a Violation of its Substantive Due Process Rights.

In the zoning and land use context, "[s]ubstantive due process . . . protects citizens from being subject to arbitrary or irrational zoning decisions." *Paterek v. Vill. of Armada, Mich.*, 801 F.3d 630, 648 (6th Cir. 2015). "To succeed on a substantive due process claim based on this theory, a plaintiff is required to show that (1) a constitutionally protected property or liberty interest exists, and (2) the constitutionally protected interest has been deprived through arbitrary and capricious action." *Id*. Plaintiff meets both requirements.

First, Plaintiff has sufficiently alleged that it has a constitutionally protected property interest. In the zoning context, to establish that a landowner possesses a property interest, he

must show a "legitimate claim of entitlement" to the benefit in question. *Standard Materials, Inc. v. City of Slidell*, 96-0684 (La. App. 1 Cir. 9/23/97), 700 So. 2d 975, 986 (citing *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972)). The entitlement derives from "state statutes, local ordinances, existing rules, contractual provisions, or mutually explicit understandings," *Blackburn v. City of Marshall*, 42 F.3d 925, 935 (5th Cir. 1995), but whether the entitlement rises to the level of "legitimate" is determined by federal law, *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 757 (2005). A legitimate claim of entitlement exists when "there is either a certainty or a very strong likelihood that the application or permit would have been granted" under state or local law. *Homeowner/Contractor Consultants, Inc. v. Ascension Par. Planning*, 32 F. Supp. 2d 384, 391 (M.D. La. 1999).

Plaintiff has adequately pled that there was a very strong likelihood that its application or permit would have been granted were it not for the IZD. The project was by-right, meaning no variance or conditional permit was required.[52] The Complaint alleges that, using the IZD's appeal standards, the CPC Executive Director had already determined that The Village met each of the six review standards and would be consistent with the Master Plan.[53] The CPC Executive Director, alongside the DAC, is charged with reviewing the project's adherence to specific approval standards—not the City Council.[54] The approval standards set forth in that review (Article 4.5 of the CZO) are almost identical to the appeal standards set forth in the IZD (Article 19.4.A.19 of same). There is thus a very strong likelihood that the CPC would have approved the application when applying the virtually identical standards of CZO Art. 4.5 as those employed in

---

[52] *Id.* at ¶ 22.

[53] *Id.* at ¶¶ 61-67; *see also* ¶¶ 22-26 (development was in full compliance with applicable zoning designation and building regulations), ¶¶ 84-90 (reasons why IZD was pretextual).

[54] *Id.* at ¶ 41. City council members do not have the power to grant or deny a project like Plaintiff's by-right development. *Id.*; *see also* CZO Arts. 4.5.A., 4.5.B.1., and 4.5.E. Defendants may dispute that, but their arguments are not appropriate at the pleading stage.

recommending that Plaintiff's appeal be granted. *See Robinson v. City of Baton Rouge*, 2015 WL 13522820, at *15 (M.D. La. Mar. 20, 2015) ("Plaintiffs contend that they complied with every applicable law with respect to the preliminary plat in question. . . . Assuming these facts are true, Defendants were not within their discretion to deny Plaintiffs' preliminary plat approval."); *see also Scott v. Greenville Cnty.*, 716 F.2d 1409, 1418 (4th Cir. 1983) (plaintiff had entitlement to the issuance of a permit "upon presentation of an application and plans showing a use expressly permitted under the then-current zoning ordinance").

Second, Plaintiff's allegations establish arbitrary and capricious actions taken by Defendants. Defendants do not appear to contest this. As described in the Complaint, Defendants' acts included: the constructive denial of Plaintiff's by-right development,[55] the imposition of an IZD to conduct entirely unnecessary and pretextual studies,[56] the overruling of the CPC's unanimous recommendation against the IZD,[57] the last-minute deletion of a new appeal procedure that would have set precise, achievable, and less discretionary standards for Plaintiff to meet in order to proceed with the development,[58] Councilmember King's resolute alliance with the ETPOA and disregard for the housing needs of his other constituents, especially in light of his conflict of interest as an affected property owner,[59] and the failure of City Council to provide any written or verbal rationale for the IZD[60] all constitute arbitrary and capricious actions that interfere with Plaintiff's property interests.

---

[55] Compl., at ¶ 109.
[56] *Id.* at ¶¶ 84-90.
[57] *Id.* at ¶ 80.
[58] *Id.* at ¶¶ 71-72.
[59] *Id.* at ¶¶ 97-99.
[60] *Id.* at ¶¶ 77-78.

B.  <u>Plaintiff Has Sufficiently Pled a Violation of its Procedural Due Process Rights.</u>

Defendants erroneously claim that Plaintiff's procedural due process claim[61] should be dismissed because Plaintiff received notice and an opportunity to be heard before the City Council. Def. Br. at 20. This fails for two reasons. First, notice and an opportunity to be heard are not the only requirements of procedural due process—rather, the hearing must be fair and impartial. A quasi-judicial or administrative decision over a land use matter that is tainted by a decisionmaker's bias or conflict of interest deprives the landowner of due process and must be invalidated. *See Withrow v. Larkin*, 421 U.S. 35, 46–47 (1975) (holding that a fair and impartial decisionmaker is a basic requirement of due process); *see also Gibson v. Berryhill*, 411 U.S. 564, 579 (1973) (bias may exist through pecuniary or personal interests of decisionmaker).

Plaintiff has pled more than enough to infer that Defendants' actions were tainted by bias. At the October 2022 meeting, Councilmember King was instructed by the City Council Clerk to remove his name from the motion on the basis that he owned property in the affected area, and he subsequently recused himself from bringing and voting on the initial IZD Motion.[62] Despite this conflict, Councilmember King drafted the IZD appeal motion that overruled the CPC Director's reasoned recommendation; proceeded in February 2023 to lead the hearing on the IZD and IZD appeal; moved to call a vote on the IZD appeal motion without allowing any other councilmember to raise questions or engage in discussion; and then voted in favor of the IZD.[63] Upon information and belief, the other members of City Council voted in favor of the IZD for one reason: to adhere to City Council's functioning "gentlemen's agreement" regarding zoning matters in which each councilmember agrees to vote in accord with the councilmember from the

---

[61] A municipal body's adjudicative conduct must be afforded procedural due process. *See County Line JV v. City of Grand Prairie*, 839 F.2d 1142, 1145 (5th Cir. 1988).
[62] Compl., at ¶ 55.
[63] *Id.* at ¶¶ 72, 75-76.

affected district.[64] As a result, Stanton Square was deprived of a fair and impartial hearing on its appeal due to Councilmember King's personal bias.

Second, setting aside the February 2023 IZD meeting, Plaintiff properly alleged that it was not afforded notice or an opportunity to be heard when Defendants passed the initial IZD motion in October 2022, which immediately put into place a moratorium on the processing of any permit application for Plaintiff.[65] As a result of the initial IZD motion, Plaintiff was prohibited from further pursuing the design review process or submitting a permit application, thereby depriving Plaintiff of its liberty and property interest in developing its property. This decision, which involved just Plaintiff and its property, was entitled to procedural due process but received none. Plaintiff's claims under 42 U.S.C. § 1983 and the Louisiana Constitution must proceed.[66]

## CONCLUSION

For the above-stated reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss.

/s/ Yiyang Wu
**YIYANG WU\***
**DAVID DEPRIEST\***
        **-Of-**
**RELMAN COLFAX PLLC**
1225 19th Street NW, Suite 600
Washington, DC 20036

        -and-

**RANDALL A. SMITH (No. 2117)**
**REAGAN R. WILTY (No. 35292)**
        **-Of-**

---

[64] *Id.* at ¶¶ 79, 158-161.
[65] *Id.* at ¶¶ 51-52, 54.
[66] Finally, because Plaintiff's federal claims—under the Fair Housing Act, Title VI of the Civil Rights Act, and 42 U.S.C. § 1983—survive Defendants' Motion to Dismiss, this Court does not need to address Defendants' final argument regarding supplemental jurisdiction. *See* Def. Br. at 20-21.

**SMITH & FAWER, L.L.C.**
201 St. Charles Avenue, Suite 3702
New Orleans, LA 70170

***Counsel for Plaintiff***

*admitted pro hac vice