UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| STANTON SQUARE, LLC, | ) |
| | ) Civil Action No. 2:23-cv-5733 |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) SECTION D |
| | ) Judge Brandon S. Long |
| THE CITY OF NEW ORLEANS, | ) |
| THE NEW ORLEANS CITY COUNSEL, | ) |
| and FREDDIE KING III, in his official | ) |
| capacity as a member of the New Orleans | ) MAGISTRATE 5 |
| City Council, | ) Judge Michael B. North |
| | ) |
| Defendants. | ) |

**STATEMENT OF INTEREST OF THE UNITED STATES**

**I.     INTRODUCTION**

The United States respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517[1] to assist the Court in interpreting the Fair Housing Act (FHA), 42 U.S.C. § 3601 *et seq.*, and Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. § 2000d *et seq.*

In this lawsuit, Plaintiff Stanton Square alleges that the City of New Orleans (City) has unlawfully prevented it from developing a multifamily apartment complex in violation of the FHA and Title VI. *See, e.g.*, Compl. (ECF No. 1) ¶¶ 50-83, 123-145. In *Inclusive Communities*, the Supreme Court acknowledged that land use decisions that restrict the development of multifamily housing can unlawfully discriminate because of race in violation of the FHA. *See Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 539-40 (2015). The Attorney General has enforcement authority under the FHA, *see* 42 U.S.C.

---

[1] Under 28 U.S.C. § 517, "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

1

§§ 3612(o), 3614, and has pursued cases challenging actions by municipalities that block the development of multifamily housing. *See, e.g.*, *United States v. City of Arlington, Tex.*, No. 4:22-cv-00030-P (N.D. Tex. Jan. 13, 2022); *United States v. Vill. of Tinley Park, Ill.*, No. 16-cv-10848 (N.D. Ill. Nov. 23, 2016). The Attorney General is also authorized to bring Title VI civil actions and is responsible for ensuring consistent enforcement of Title VI across all federal agencies. *See* 28 C.F.R. § 42.108; Exec. Order No. 12250, 45 Fed. Reg. 72, 995 (Nov. 2, 1980). The United States, therefore, has a strong interest in ensuring the proper application of the FHA and Title VI in this context.

## II.   BACKGROUND

In March 2021, Plaintiff Stanton Square purchased an undeveloped tract of land in Lower Coast Algiers (LCA) for the purpose of developing multi-family rental housing.[2] Compl. ¶ 19. The land has been zoned to allow the development of lower density multifamily housing since the 1980s. *Id*. ¶ 20. Such development was also consistent with the future use outlined in the City's Master Plan. *Id*. ¶¶ 9, 21-23, 63-64, 67.

In May 2022, Plaintiff submitted plans to the Design Advisory Committee (DAC) of the City Planning Commission (CPC) for the development of a 278-unit multifamily apartment complex called The Village at English Turn (the Village or Proposed Development). *Id*. ¶¶ 24, 27, 41-42. Soon after, constituents expressed fierce opposition to the development, both in communications to City officials and at a DAC hearing held in August 2022. *Id*. ¶¶ 43, 46-47. Much of this opposition focused on the character of the likely residents rather than traditional land use concerns. *Id*. ¶¶ 46-47. In response to this opposition, the City Council passed resolutions that froze any multifamily development in the LCA area until at least March 2024.

---

[2] As is appropriate at the motion to dismiss stage, this brief takes as true the factual allegations of Plaintiff's Complaint. The United States otherwise takes no position on the underlying facts of this case.

*Id*. ¶¶ 48-49, 51-56, 68-82.  Specifically, the Council's action prohibited any City agency from accepting or granting any permits for the development of multifamily housing, including Plaintiff's development, while the moratorium was in effect.  *Id*. ¶ 54.

The CPC recommended that the City Council grant Plaintiff's appeal of this moratorium, finding that the development was consistent with the City's zoning laws and should be approved. *Id*. ¶¶ 61-67.  The City rejected the CPC's unanimous recommendation and denied the appeal. *Id*. ¶¶ 75-76.  The City's action has prohibited the Plaintiff from taking any action to develop the Village from October 6, 2022, to at least March 19, 2024.  *Id*. ¶ 82.

The City's Motion urges this Court to dismiss Plaintiff's complaint, arguing that: (1) Plaintiff's statistics showing that Black and Hispanic residents in the area are more likely to be renters who may reside at the development as compared to white residents are insufficient to allege a disparate impact on Black residents, Mem. in Supp. of Mot. to Dismiss (ECF 14-1) (Defs.' Mem.) at 9-11; (2) Plaintiff's allegations that the City capitulated to the race-based oppositions of its constituents are insufficient to raise an inference of discriminatory intent, *id.* at 11-13; (3) Plaintiff cannot establish any harm because it has never applied for or received any building permits, *id.* at 13-14; and (4) Plaintiff cannot establish any harm because it has not alleged that its Proposed Development had any plan to accept any person who might receive any federal financial assistance, *id*. at 16.

As explained below, none of these arguments have merit.  This Court should therefore reject these arguments in disposing of the City's Motion.[3]

---

[3] The United States expresses no opinion on the other issues raised in the City's Motion.

### III. ARGUMENT

#### A. Plaintiff Plausibly Alleges That the City's Actions Have a Disparate Impact on Black and Hispanic Residents and Perpetuate Segregation in Violation of the Fair Housing Act

"[D]isparate impact claims are cognizable under the [FHA]" and are "consistent with the FHA's central purpose." *Inclusive Communities*, 576 U.S. at 539, 545. Among other things, the FHA's provisions prohibiting discriminatory housing practices proscribe "zoning laws and other housing restrictions that function unfairly to exclude minorities from certain neighborhoods without any sufficient justification." *Id*. at 539. "Suits targeting such practices[,]" including restrictions on multifamily rental housing, "reside at the heartland of disparate-impact liability." *Id*. at 539-40 (citing *Town of Huntington, N.Y. v. Huntington Branch, N.A.A.C.P.,* 488 U.S. 15, 16-18 (1988) (*per curiam*) (invalidating zoning law preventing construction of multifamily rental units); *United States v. City of Black Jack, Mo.*, 508 F.2d 1179, 1182-88 (8th Cir. 1974) (invalidating ordinance prohibiting construction of new multifamily dwellings))).

United States Department of Housing and Urban Development (HUD) regulations provide that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, * * * familial status, or national origin." 24 C.F.R. § 100.500(a). A plaintiff has the initial "burden of proving that a challenged practice caused or predictably will cause a discriminatory effect." 24 C.F.R. § 100(c)(1). Once the plaintiff satisfies this initial requirement, the burden shifts to the defendant who must "prov[e] that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the [] defendant." 24 C.F.R. § 100(c)(2).

Contrary to Defendants' claims, Plaintiff plausibly alleges that the City's moratorium is more likely to have a disparate impact on the Black and Hispanic residents of New Orleans.

4

Plaintiff does so by alleging statistics that show Black and Hispanic people are more likely than whites to be renters in the New Orleans area. Compl. ¶¶ 2, 36, 92-96. For example, Plaintiff alleges that while Black residents represent roughly half (57 percent) of the City's population, they make up 60 percent of the City's renters and only 48 percent of its homeowners. *Id*. ¶ 92. Since the Village is designed as affordable, multi-family rental units, it stands to reason that Black and Hispanic residents of New Orleans are more likely to live in the Village after it is built. *Id*. ¶¶ 2-3, 24, 27, 29, 36. Plaintiff also alleges sufficient facts to support its claim that the City's moratorium perpetuates segregation. The property where the Village would be located, an area known as Lower Coast Algiers (LCA), is situated on a peninsula, with roughly half of it located within the City and the other half, to the southwest, adjacent to Plaquemines Parish. *Id*. ¶¶ 19, 31. The English Turn community, located at the center of the peninsula, is more than 60 percent white and approximately 32.8 percent Black and Hispanic, and the adjacent Plaquemines Parish is only 20 percent Black or Hispanic. *Id*. ¶¶ 2, 5, 32, 34. By contrast, the area directly west of the peninsula has a disproportionately (85.8%) Black and Hispanic population. *Id*. ¶ 5. In short, the Village would be an affordable housing option located in a predominantly white peninsula.

Defendants assert that the only way Plaintiff can show disparate impact is by providing details about its rents and analyzing the demographics of renters in the LCA, which includes English Turn and the area to the west but does not include the portion of the peninsula in Plaquemines Parish, because LCA is the area that is subject to the moratorium. Defs.' Mem. at 2. However, HUD regulations make clear that all Plaintiff needs to do is show that a practice "actually or predictably results in a disparate impact;" the regulations do not prescribe any specific way of making that showing. 24 C.F.R. § 100.500(a). And the City cites no authority that would require Plaintiff to confine its analysis of disparate impact to political boundaries that

may not reflect the actual impact of the challenged decision. *See* Defs.' Mem. at 10-11. Plaintiff alleges that because Black and Hispanic people are more likely to be renters than whites in New Orleans, not building the Village would adversely impact Black and Hispanic renters more than whites. Compl. ¶¶ 36, 92-95. And they plausibly allege that this fact, coupled with the segregated housing patterns in the peninsula, *id*. ¶¶ 2-5, 34, 36-37, means that the development of an almost 300-unit apartment complex in English Turn, *id*. 24, 27, will significantly increase the percentage of Black and Hispanic families in that area, *id*. ¶¶ 29, 35-37, 92-94, and that blocking it will perpetuate segregation there, *id*. ¶ 95.

The court's decision in *Greater New Orleans Fair Housing Action Center v. St. Bernard Parish*, 641 F. Supp. 2d 563, 567-68 (E.D. La. 2009), is instructive. There, the court concluded that a Parish moratorium on the development of structures with five (5) or more dwellings had a disparate racial impact on Black people. *Id*. at 568. In reaching this conclusion, the court relied in part on evidence that showed that 90 percent of such structures would be rental buildings and that Black people in the Greater New Orleans area were twice as likely as whites to be renters. *Id*. at 567 (including premise that "African-Americans are disproportionately affected because the moratorium reduces the supply of rental properties," in this analysis). The court rejected the Parish's argument, indistinguishable from the City's argument here, that only statistics regarding the Parish were relevant and that areawide statistics could not be used to establish disparate impact. *Id*. at 568. For purposes of a motion to dismiss, Plaintiff's allegations, based on both city-wide and more concentrated statistics, are plausible and consistent with the analysis adopted in *St. Bernard Parish*.

> **B. Plaintiff Has Plausibly Alleged That the City Acted with Discriminatory Intent in Violation of the Fair Housing Act and Title VI**

In its Complaint, Plaintiff has sufficiently alleged that the City engaged in intentional discrimination based on race, color, or national origin under both the FHA and Title VI.

6

When, as here, a plaintiff opts to rely on the factors articulated by the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), to demonstrate discriminatory intent through direct or circumstantial evidence, the plaintiff need provide "very little such evidence . . . to raise a genuine issue of fact . . . ; any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a fact-finder."  *Pacific Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1159 (9th Cir. 2013) (quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1409 (9th Cir. 1996)).

In *Arlington Heights*, a case brought under the Equal Protection Clause concerning an allegedly discriminatory rezoning denial, the Supreme Court outlined a non-exhaustive list of circumstantial evidence factors that may be probative of a government entity's discriminatory intent.  *See* 429 U.S. at 266-68.  The Fifth Circuit applied these factors in *Overton v. City of Austin*, and identified them as follows: "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history. . . ." 871 F.2d 529, 540 (5th Cir. 1989) (citing *Arlington Heights*, 429 U.S. at 267-68).  Under the *Arlington Heights* framework, Plaintiff's Complaint more than sufficiently alleges intentional discrimination under both the FHA and Title VI to defeat a motion to dismiss.

> **1. Plaintiff adequately alleges the specific sequence of events leading up to the City's zoning decisions demonstrate the decisions were motivated, at least in part, by discriminatory opposition from constituents.**
>
> a. <u>Plaintiff adequately alleges that there was discrimination-based opposition to the proposed development</u>.

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266.  Courts have acknowledged that direct evidence of

7

discrimination is especially unlikely to be forthcoming in cases involving the racial motivation of public officials. *See, e.g.*, *Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1064 (4th Cir. 1982) (stating "[m]unicipal officials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority."); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977) ("As overtly bigoted behavior has become more unfashionable, evidence of intent has become harder to find.").

Recognizing that expression of discriminatory sentiments is often more covert, courts—including in this circuit—have found that statements like those made by constituents here may indicate discriminatory animus. For example, in *St. Bernard Parish*, the court considered whether race was implicated in an editorial concerning proposed mixed-income housing developments, which was published in St. Bernard Parish's official newspaper. *See* 641 F. Supp. 2d at 571-72. Although the editorial did not directly mention race, the court determined that its references to "ghetto, crime, drugs, violence," and certain multifamily housing developments "juxtaposed against their 'threat' and the 'shared values' of overwhelmingly Caucasian St. Bernard Parish" were "clearly . . . an appeal to racial as well as class prejudice." *Id*. at 572.

Other courts have similarly concluded that, in the context of opposition to affordable housing development, appeals to concerns about increased crime can be discriminatorily motivated. *See, e.g.*, *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 506-07 (9th Cir. 2016) (finding that, along with other allegations, complaints to the effect that the type of residents who would live in a development would "create a 'low cost, high crime neighborhood'" offered plausible circumstantial evidence of discriminatory animus); *see also Smith*, 682 F.2d at 1066 (affirming district court's interpretation of concerns about "undesirables" and "personal safety due to the influx of 'new' people" as "'camouflaged' racial expressions"); *Atkins v. Robinson*,

8

545 F. Supp. 852, 874 (E.D. Va. 1982), *aff'd*, 733 F.2d 318 (4th Cir. 1984) (noting that a county official's comments that "crime is on the rampage in housing projects" and expressing fear that they "would degenerate to slum-like conditions, with an abundance of crime" may "rest on a veiled reference to race.").

Here, Plaintiff alleges that constituents opposed the Village primarily because of the alleged character of the prospective residents, and not because of traditional zoning concerns regarding the use of the property.  *See* Compl. ¶¶ 45-47.  Like the comments in the aforementioned cases, constituents asserted that residents of the proposed multifamily housing would engage in criminal activity, and would bring "additional crime," "health concerns" and "deplorable conditions" to the neighborhood, would cause existing homeowners and businesses to leave "encourag[ing] disinvestment," and would burden the community with having to "tak[e] care of the families that would reside in the complex." *Id*. ¶¶ 46-47.  The prospective residents of "[t]his development" would be "an affront to [the] lifestyles" of current homeowners.  *Id.*  Comments expressing that the type of residents who will occupy an apartment complex like the Village will be incompatible with the values or "lifestyles" of the existing residents are very similar to the comments other courts have found to be evidence of discriminatory intent.  *See* cases cited above, *supra* at 9; *see also Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 608-10 (2nd Cir. 2016) (upholding district court's finding that references to maintaining the "flavor" and "character" of a city were "code words for racial animus.").

9

> b. *Plaintiff adequately alleges that the City capitulated to discrimination-based objections of its constituents and the reasons proffered by the City to justify the moratorium were pretextual.*

While making little attempt to defend these comments, the City argues that it cannot be faulted merely for listening to the concerns of its constituents.[4] Defs.' Mem. at 13. Plaintiff, however, plausibly alleges the City not only listened to, but closely coordinated with and effectuated the discriminatory objectives of those who opposed the proposed development. Compl. ¶¶ 50-57. It is well established that government entities can be held liable for capitulating to the discriminatory motives of their constituents, regardless of whether public officials explicitly endorse or personally agree with those motives. *See*, *e.g.*, *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 580 (2d Cir. 2003) (upholding the district court's finding of intentional discrimination based, in part, on the history of hostility of neighborhood residents and their pressure on the Mayor and other city officials); *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 49 (2d Cir. 1997) (noting that a city "may not base its decisions on the perceived harm from stereotypes and generalized fears" and "a decision made in the context of strong, discriminatory opposition becomes tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter.");[5] *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1124 (2nd Cir. 1987) (noting "[t]he Supreme Court has long held, in a variety of circumstances, that a governmental body may not escape liability . . . merely because its discriminatory action was undertaken in response to the desires of a majority of its citizens."); *Smith,* 682 F.2d at 1066-67 (affirming district court's finding that Town acted with

---

[4] Defendants' reliance on *Four States Realty Co., Inc. v. Baton Rouge*, 309 So. 2d 659, 666 (La. 1974), to support their argument that they cannot be liable for listening to the concerns of their constituents is inapposite to Plaintiff's Title VI and FHA claims, which do not challenge the constitutionality of the zoning decisions, as was the case in *Four States Realty*, but rather allege intentional discrimination in violation of federal statutes.

[5] *Recognized as superseded on other grounds by Zervos v. Verizon New York, Inc*, 252 F.3d 163, 171 n.7 (2d Cir. 2001).

discriminatory intent when it halted development of public housing in response to racially motivated opposition by residents); *City of Black Jack*, 508 F.2d at 1185 n.3 (Eighth Circuit agreeing with Tenth Circuit's opinion that "it is enough for the complaining parties to show that the local officials are effectuating the discriminatory designs of private individuals.") (internal citations omitted).[6] "[C]itizen comments can demonstrate that public officials acted with bias" where "the circumstances surrounding those statements strongly suggest that the public officials either adopted the citizens' biases or acted directly in response to citizen's discriminatory desires." *Jim Sowell Constr. Co., Inc. v. City of Coppell*, 61 F. Supp. 2d 542, 551 (N.D. Tex. 1999).

For example, the court in *St. Bernard Parish* considered the *Arlington Heights* factors in finding that St. Bernard Parish had, in violation of the Fair Housing Act, acted with discriminatory intent in obstructing applications to re-subdivide properties for multifamily housing. *See St. Bernard Parish*, 648 F. Supp. 2d at 809-19. In discussing "the specific sequence of events leading up to [St. Bernard Parish's] decision," the court noted that it was "troubled by the sudden and abrupt change in treatment" of the applications that followed a public hearing. *Id*. at 813. At this hearing, the court observed that "many of the public and official comments" in opposition to the applications included language that the court deemed to be "camouflaged racial expressions." *Id*. at 811. Here, Plaintiff has plausibly alleged a sequence

---

[6] *See also Cmty. Hous. Tr. v. Dep't of Consumer & Regul. Affs.*, 257 F.Supp.2d 208, 227 (D.D.C. 2003) (regarding neighborhood opposition, "the law is quite clear that 'even where individual members of government are found not to be biased themselves,' plaintiffs may demonstrate a violation of the FHA[] if they can show that 'discriminatory governmental actions are taken in response to significant community bias.'") (quoting *Tsombanidis*, 129 F. Supp 2d 136, 152 (D. Conn. 2001); *United States v. City of Birmingham*, 538 F. Supp. 819, 828 (E.D. Mich. 1982), *aff'd as modified*, 727 F.2d 560 (6th Cir. 1984) (clarifying that plaintiff "need not prove that the [governing body] itself intended to discriminate on the basis of race[;] . . . it is sufficient to show that the decision-making body acted for the sole purpose of effectuating the desires of private citizens" and "that racial considerations were a motivating factor behind those desires.").

of events leading up to the City's zoning decisions that demonstrate the decisions were motivated, at least in part, by discriminatory opposition from residents. *See, e.g.*, Compl. ¶¶ 16-17, 43-47, 50-52, 55, 57; *cf.* ¶¶ 9, 14, 22, 24, 64, 67 (alleging that promoting affordable housing option is among the City's top priorities and consistent with its Master Plan).

### 2. Plaintiff adequately alleges that the City departed from its normal procedures.

Procedural departures "might afford evidence that improper purposes are playing a role." *Arlington Heights*, 429 U.S. at 267. Such departures demonstrate invidious intent when they "occur[] in a context that suggests the decision-makers were willing to deviate from established procedures in order to accomplish a discriminatory goal." *Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty. Tex.*, 6 F.4th 633, 640 (5th Cir. 2021)

Here, Plaintiff plausibly alleges that the City's actions regarding the Village depart from the City's normal zoning procedures. *See, e.g.*, Compl. ¶¶ 80, 90-91. The Complaint sets forth that "it is exceedingly rare for the City Council to overrule the Planning Commission's recommendation and move forward to block the development of housing." *Id.* ¶ 80. Members of the CPC allegedly "expressed incredulity at the use of an [interim zoning district] to target and block by-right, multi-family housing development" which also shows that the zoning decisions were "unorthodox." *Id.* ¶ 91.

Substantive departures may also be relevant, "particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Arlington Heights*, 429 U.S. at 267. For example, in *Dailey v. Lawton, Okl.*, the Tenth Circuit upheld a finding of racial motivation where plaintiffs planned to build low-income housing, but the city refused to rezone the land to high-density residential even though all of the surrounding area was zoned high-density residential and the present and former planning directors for the city testified there was no reason "from a zoning standpoint" why the land

12

should not be rezoned. 425 F.2d 1037, 1040 (10th Cir. 1970). Here, Plaintiff has alleged that the CPC's "Executive director found that the Development met each of the six (6) review standards that City Council established in the [interim zoning district] Motion," which included "standards regarding traffic and environmental impacts;" "the Development would be consistent with the Master Plan;" "and that approving the Appeal would be consistent with the CPC's recommendation …." Compl. ¶¶ 67, 88. Plaintiff's allegations that the City reached contrary zoning decisions provide evidence of a substantive departure from the recommendation of the CPC and its Executive Director. Plaintiff also alleges that this is the first time the City has used an interim zoning district to block multi-family housing and its use "marks a significant departure from the City's stated policies on supporting the development of affordable housing." *Id.* ¶¶ 90-91. Collectively, these alleged procedural and substantive departures provide circumstantial evidence of discriminatory intent under *Arlington Heights*.

Plaintiff's allegations include precisely the types of facts that courts regularly examine under *Arlington Heights* when evaluating intentional discrimination claims and plausibly allege an indication that discriminatory motive tainted the City's zoning decisions. Ultimately, "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts …." *Washington v. Davis*, 426 U.S. 229, 242 (1976) (discussing analysis of intentional discrimination generally). Because the Complaint sets forth allegations of facts that courts regularly examine under *Arlington Heights* when evaluating intentional discrimination claims and plausibly alleges that the City's zoning decisions were enacted, at least in part, with discriminatory intent, Plaintiff should be permitted to engage in discovery on these claims.

13

### C. Plaintiff Plausibly Alleges that the City Has Made Unavailable or Restricted Housing on a Prohibited Basis, Harming Plaintiff and the Village's Prospective Residents

The City argues that the Complaint does not allege that the City harmed anyone because the moratorium is only a "temporary delay," and Plaintiff "has not filed for or received any building permits." Defs.' Mem. at 13. This argument fundamentally misunderstands the facts alleged and the binding precedent.

The FHA makes it unlawful, in relevant part, "to make unavailable or deny a dwelling to any persons because of race" or another prohibited basis. 42 U.S.C. § 3604(a). The FHA also makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith" because of a prohibited basis. 42 U.S.C. § 3604(b). Plaintiff alleges that by blocking the development of the Village, the City has made housing unavailable by restricting Plaintiff's efforts to develop its property and preventing prospective residents from renting the apartments that would be constructed there because of a prohibited reason. Compl. ¶¶ 114-116, 124-25. That is sufficient to state a claim under the FHA.

Although the City characterizes the moratorium as a "temporary delay," Defs.' Mem. at 13, Plaintiff alleges that the moratorium has barred it from developing the property since October 2022, that the prohibition will continue until at least March 2024, and that the City can extend it for up to another 360 days. Compl. ¶ 82. And the City has already extended the project's timeline by at least 17 additional months when it superseded the CPC's recommendation to lift the moratorium on appeal. *See id.* ¶¶ 61-67, 81-82. It defies logic to claim that such a lengthy delay is harmless as a matter of law.

Nor does the fact that Plaintiff never had an opportunity to apply for or obtain building permits doom its claims. Plaintiff's designs were still under review by the DAC when the City

14

passed its moratorium. *Id*. ¶¶ 48-56. And the moratorium barred City agencies from accepting or issuing any permits for the Village or any other multifamily development. *Id*. ¶ 54.

Plainly, housing restrictions can violate the FHA long before building permits are sought. In *Arlington Heights*, the Supreme Court held that a Black worker who alleged he would move into a proposed development if it was built had standing to challenge the Village's refusal to grant zoning approval for the housing. 429 U.S. at 563. And in *St. Bernard Parish*, the court found a moratorium on the development of structures with five (5) or more dwellings violated the FHA. 641 F. Supp. 2d at 563. In sum, Defendants' delay is not "temporary" and Defendants' inability to accept or issue permit applications while the moratorium is in effect negates any complaint that Plaintiff did not submit such an application.

### D. A Plaintiff Needs Only to Allege Discrimination Based on Race, Color, or National Origin by a Federally Assisted Program or Activity to Bring a Title VI Claim

In its Complaint, Plaintiff alleges that the City engaged in intentional discrimination based on race, color, or national origin and that the City is a recipient of federal financial assistance. These allegations are sufficient to defeat a motion to dismiss under Title VI.

Title VI prohibits discrimination based on race, color, or national origin in programs and activities receiving federal financial assistance. Specifically, Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. "Federal financial assistance" can be an award or grant of money or may include the use or rental of federal land or property at below market value, federal training, a loan of federal personnel, subsidies, and other arrangements with the intention of providing assistance. *See United States Dep't of Transp. v. Paralyzed Veterans*, 477 U.S. 597, 607 n.11 (1986) ("Although the word 'financial' usually

15

indicates 'money,' federal financial assistance may take nonmoney form," citing *Grove City College v. Bell*, 465 U.S. 555, 564-65 (1984)). Further, the courts, consistent with congressional intent, initially interpreted "program or activity" broadly to encompass the entire institution in question. For example, in *Bob Jones Univ. v. Johnson*, Title VI covered all of the services and activities of a university even where the sole federal assistance was federal financial aid, which is considered assistance to the university. *See* 396 F. Supp. 597, 603 (D.S.C. 1974), aff'd, 529 F.2d 514 (4th Cir. 1975); S. Rep. No. 64 at 10, reprinted in 1988 U.S.C.C.A.N. at 12.[7] A "recipient" is an entity or person that receives federal financial assistance. *See, e.g.*, 24 C.F.R. § 1.2(f) (HUD Title VI regulations defining "recipient"). Under Title VI, it is the recipient who is barred from discriminating against persons because of race, color, or national origin with respect to the operation of covered programs or activities.

Plaintiff's Complaint sufficiently alleges a Title VI claim. Plaintiff alleges that the City is a recipient of a HUD Community Development Block Grant. Compl. ¶¶ 10, 140. HUD Community Development Block Grants are federal financial assistance. *See* 24 C.F.R. § 1.2(e)

---

[7] In 1984, the Supreme Court in *Grove City*, 465 U.S. at 571, severely narrowed the interpretation of "program or activity." The Court ruled that Title IX's prohibitions against discrimination applied only to the specific office of an institution's operations that received the federal funding. Because the college received federal funds as a result of federal financial aid, the Court found that the "program or activity" was limited to the college's financial aid program. *Id.* at 574. In response to *Grove City*, Congress passed the Civil Rights Restoration Act of 1987 (CRRA), Pub. L. No. 100-259, 102 Stat. 28 (1988). In the CRRA, Congress made clear that a "program or activity" under Title VI explicitly encompasses "all of the operations of . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government . . . [,] any part of which is extended Federal financial assistance." 42 U.S.C. § 2000d-4a. Thus, when evaluating the scope of coverage under Title VI, what is relevant are the activities of the recipient, not the purpose of a grant. There is one narrow exception to this general rule that is inapplicable to this case—Title VI statutorily restricts claims of employment discrimination to instances where a "primary objective" of the financial assistance is to provide employment. 42 U.S.C. § 2000d-3. Because Plaintiff's Title VI claims do not allege employment discrimination, the CRRA's general rule applies, and the purpose of the grant is irrelevant to coverage.

16

(HUD Title VI regulations defining "Federal financial assistance").  Therefore, the City is required to comply with Title VI with respect to the operation of its covered programs or activities.  Plaintiff alleges that the City intentionally discriminated by acting to obstruct and delay Plaintiff's Proposed Development through zoning decisions.  *See, e.g.*, Compl. at ¶¶ 126, 130, 134, 139.  Specifically, Plaintiff alleges that the City's zoning decisions are based on discriminatory motives related to the race and national origin of the Proposed Development's likely residents.  *Id*. at ¶ 126.

Defendants contend that Plaintiff's Title VI claims must be dismissed because the "Plaintiff makes no effort to show that its Proposed Development had any plan to accept any person who might receive any Federal financial assistance."  Defs.' Mem. at 16.  This argument, however, misapprehends Title VI's requirements.  Plaintiff alleges that residents who would benefit from the development and operation of an affordable, multi-family development like the Proposed Development are likely to include African American and Hispanic residents, and the City—a recipient of federal financial assistance itself—intentionally discriminated against these protected classes by making zoning decisions that deprive them of affordable housing.  *See, e.g.*, Compl. ¶¶ 126, 127, 134, 141, 144, 148.  Plaintiff is *not* required to allege that potential residents of the Proposed Development are themselves recipients of federal financial assistance or intended beneficiaries of a specific program or activity receiving federal financial assistance.  *See* 42 U.S.C. § 2000d-4a.  What is relevant are the actions of the recipient—meaning the City's actions.

Congress enacted the CRRA to ensure the long-standing broad application of anti-discrimination statutes, such as Title VI.  S. Rep. No. 100-64, at 2 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 3, 3-4.  Per the CRRA, when *any* part of a state or local agency or department receives federal financial assistance, Title VI covers *all* the operations of that agency or

department regardless of whether the alleged discrimination occurred in the specific portion of the program or activity receiving federal funding.  After the enactment of the CRRA, "a plaintiff who had not been able to sue . . . because he was not an intended beneficiary of the specific program or activity receiving federal financial assistance now could sue." *T.S. v. Heart of CarDon, LLC*, 43 F.4th 737, 746 (7th Cir. 2022) (abrogating *Simpson v. Reynolds Metals Co.*, 629 F.2d 1226 (7th Cir. 1980)).  In *T.S.*, the Seventh Circuit noted that the CRRA had the effect of "relieving a would-be plaintiff from establishing his direct connection to the part of a covered entity's operations receiving federal financial assistance."); *see also Patterson v. Sandage*, No. 1:20-CV-01073, 2023 WL 2582613, at *5 (C.D. Ill. Mar. 20, 2023) (noting that after the CRRA the plaintiff is relieved "of the burden of establishing a strict nexus connecting the precise purpose of the federal assistance, the alleged discrimination, and the plaintiff himself.").

The City, as a recipient of federal funds, must ensure that the programs and activities it provides do not discriminate on the basis of race, color, or national origin in violation of Title VI.  And per the CRRA, the definition of a program or activity must be interpreted broadly.  Plaintiff has therefore sufficiently stated a claim under 42 U.S.C. § 2000d, and Defendants' arguments should be rejected.

### IV.  CONCLUSION

For the reasons stated above, the United States respectfully requests that the Court dispose of Defendants' Motion in a manner consistent with the views expressed in this Statement.

**Dated:**  December 29, 2023            **Respectfully submitted,**

|  |  |
|---|---|
| DUANE A. EVANS<br>U.S. Attorney<br>Eastern District of Louisiana | KRISTEN CLARKE<br>Assistant Attorney General<br>Civil Rights Division<br>CARRIE PAGNUCCO<br>Chief, Housing & Civil Enforcement<br>CHRISTINE STONEMAN<br>Chief, Federal Coordination & Compliance<br>TIM MORAN<br>Deputy Chief, Housing & Civil Enforcement<br>COTY MONTAG<br>Deputy Chief, Federal Coordination & Compliance |
| By:   /s/ *Sandra Ema Gutierrez*<br>SANDRA EMA GUTIERREZ<br>Assistant U.S. Attorney<br>LA Bar # 1788<br>650 Poydra Street, Ste. 1600<br>New Orleans, LA 70130<br>Phone: (504) 680-3124<br>sandra.gutierrez@usa.doj.gov | By:  */s/ Yenisey Rodríguez*<br>YENISEY RODRÍGUEZ<br>Trial Attorney, Housing & Civil Enforcement<br>DC Bar # 1600574<br>ALYSSA LAREAU<br>LAUREN LOVETT<br>Trial Attorneys, Federal Coordination & Compliance<br>Civil Rights Division<br>U.S. Department of Justice<br>150 M Street, NE<br>Washington, DC 20530<br>Phone: (202) 598-5799<br>yenisey.rodriguez@usdoj.gov |

*Attorneys for the United States of America*