UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

STANTON SQUARE, LLC                          CIVIL ACTION

VERSUS                                       NO. 23-5733

THE CITY OF NEW ORLEANS, ET AL.              SECTION "O"

ORDER AND REASONS

Before the Court in this housing discrimination case are two motions[1] to dismiss under Federal Rule of Civil Procedure 12(b)(6) filed by (i) the New Orleans City Council (the "City Council") and New Orleans City Councilmember Freddie King, III in his official capacity as a member of the City Council ("Councilmember King"); and (ii) the City of New Orleans (the "City"). Because the City adopts and incorporates all arguments that were raised by the City Council and Councilmember King that apply to it, the Court considers the two motions together. Plaintiff Stanton Square, LLC ("Stanton Square") opposes[2] the motions. For the following reasons, the motions to dismiss are **GRANTED IN PART** and **DENIED IN PART**.

I.    BACKGROUND

This case arises from Stanton Square's allegations that the City of New Orleans, the New Orleans City Council, and Councilmember King discriminatorily prevented Stanton Square from building an apartment complex in Lower Coast Algiers, a neighborhood in New Orleans. Because the Defendants move to dismiss under Rule 12(b)(6), the Court accepts as true the following well-pleaded facts drawn

[1] ECF No. 89, 93.
[2] ECF No. 97.

from Stanton Square's Second Amended Complaint ("SAC").[3] *See Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 190 (5th Cir. 2009).

In 2021, Stanton Square purchased property in Lower Coast Algiers located near the wealthy, gated "English Turn community."[4] Stanton Square purchased the property with the intent of developing an affordable multi-family apartment complex called The Village at English Turn ("The Village").[5]

At the time of Stanton Square's purchase, the property was—and had been since the 1980s—zoned Suburban Multi-Family Residential and Suburban Pedestrian-Oriented Corridor Business District. The Suburban Multi-Family Residential zoning allows for the development of lower-density multi-family housing, with up to 35 units per acre. The property is one of several lots in Lower Coast Algiers that was zoned Suburban Multi-Family Residential.[6] There are currently no buildings on the property, but much of the infrastructure necessary to build multi-family housing, including water, sewer, and drainage service, were in place at the time of the purchase.[7] When Stanton Square purchased the property, its development plans were consistent with the Future Land Use designation for the property in the City's "Master Plan," which was a plan adopted by the City in 2010 to guide the City's growth.[8]

---

[3] ECF No. 81.
[4] *Id.*¶¶ 45, 60.
[5] *Id.* ¶¶ 4, 45-46.
[6] *Id.* ¶ 48.
[7] *Id.* ¶ 47.
[8] *Id.* ¶¶ 49-50.

On May 18, 2022, as required by the local zoning ordinance for developments over 40,000 square feet, Stanton Square submitted its project proposal application for the development of The Village to the New Orleans City Planning Commission's ("City Planning Commission") Design Advisory Committee.[9] Within weeks of Stanton Square's application for a design review with the City Planning Commission, residents of the surrounding area, including the mostly white English Turn community and members of its Property Owners' Association, launched a discriminatory campaign against the development.[10] The campaign included references to the proposed apartments' negative impact on the area's crime, safety, and property values—which Stanton Square alleges to be coded racial expressions and stereotypes of the intended residents of The Village.[11] Meanwhile, supporters of the development plans argued publicly that the project would bring needed affordable housing to New Orleans, and that efforts to prevent the development of multi-family housing would further segregation in Lower Coast Algiers.[12]

On October 6, 2022—just a few months after the English Turn community residents began campaigning against The Village—Councilmember King introduced a motion to the City Council to establish a new Rural Protection Interim Zoning District ("IZD"). The IZD included the area that encompasses Stanton Square's property. The establishment of the IZD placed an immediate moratorium on issuing permits for multi-family housing and commercial developments in Lower Coast

---

[9] *Id.* ¶¶ 69-70.
[10] *Id.* ¶ 4.
[11] *Id.* ¶ 5.
[12] *Id.* ¶ 102.

Algiers.[13] Although the new IZD included a few other properties around English Turn that are also zoned Suburban Multi-Family Residential, Stanton Square's property was the only one in process of development at that time. The City Council voted to pass the Motion and establish the IZD.[14]

The IZD Motion allowed for anyone potentially aggrieved by the IZD to appeal to the City Planning Commission, which would then make a recommendation of whether to grant or deny the Appeal.[15] Stanton Square appealed the establishment of the IZD to the City Planning Commission.[16] After a public hearing, the City Planning Commission unanimously recommended that the City Council grant Stanton Square's appeal and overturn the creation of the IZD.[17] In a report dated December 29, 2022, the Executive Director of the City Planning Commission found that Stanton Square's development met each of the six appeal review standards that the City Council established in the IZD Motion.[18]

A little over a month after the report was released, at the February 2, 2023 meeting, the City Council overruled the City Planning Commission and voted to uphold the IZD, denying Stanton Square's appeal.[19] This was a procedural aberration, as the City Council rarely overrules the City Planning Commission's recommendations.[20] The City Council's cited basis for overruling the City Planning

---

[13] *Id.* ¶¶ 78-79.
[14] *Id.* ¶¶ 80-85.
[15] *Id.* ¶ 86.
[16] *Id.* ¶ 87.
[17] *Id.* ¶¶ 93-94.
[18] *Id.* ¶¶ 94-95.
[19] *Id.* ¶ 105.
[20] *Id.* ¶ 109.

Commission were studies that supposedly needed to be performed during the duration of the IZD, which was "deemed necessary and in the best interest of the City of New Orleans."[21] The IZD ordinance formally became law on March 19, 2023.[22]

The original IZD was set to expire on March 19, 2024. But the City Council extended the IZD until March 3, 2025.[23] Shortly before the extension was set to expire, on February 9, 2025, the City Council permanently downzoned the property from Suburban Multi-family Residential to Residential Single Family Post-War. This new zoning designation conflicted with the City's Future Land Use plan, another procedural aberration.[24]

On October 3, 2023, Stanton Square first filed suit against Defendants, alleging violations of the Fair Housing Act, Civil Rights Act, and U.S. Constitution.[25] Stanton Square amended its complaint twice. In its Second Amended Complaint, Stanton Square asserts that the IZD and permanent downzoning of the property after decades of multi-family zoning exacerbates racial disparities and reflects an effort to stop racial minorities and families with children from moving to the area.[26] Stanton Square brings claims against Defendants for violations of (1) the Fair Housing Act, 42 U.S.C. § 3604(a) and § 3604(b); (2) the Fair Housing Act, 42 U.S.C. § 3617; (3) Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*; (4) the Louisiana Equal Housing Opportunity Act, La. R.S. § 51:2601, *et seq*.; (5) the Due Process Clause of

---

[21] *Id.* ¶¶ 106-7.
[22] *Id.* ¶ 110.
[23] *Id.* ¶¶ 111-114.
[24] *Id.* ¶¶ 11, 163.
[25] ECF No. 1.
[26] ECF No. 81 ¶ 131.

the U.S. Constitution via 42 U.S.C. § 1983 and the Louisiana Constitution; as well as (6) an inverse condemnation claim under the Louisiana Constitution Article 1 § 4. As relief from Defendants' alleged violations, Stanton Square requests that the Court: (i) enter judgment on each count in favor of Plaintiff; (ii) enjoin Defendants from enforcing the permanent downzoning of Plaintiff's property; (iii) grant declaratory relief; and (iv) award compensatory and punitive damages and reasonable attorneys' fees, costs, and other expenses under 42 U.S.C. § 1983 and the Louisiana Equal Housing Opportunity Act.[27]

Defendants move to dismiss Stanton Square's claims under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. Stanton Square opposes. For the following reasons, the Court grants in part and denies in part the motion.

## II.    LEGAL STANDARD

Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint that does not meet Rule 8(a)(2)'s pleading standard should be dismissed for failing to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitations of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at

---

[27] *Id.* ¶¶ 242-292.

555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

When considering a Rule 12(b)(6) motion to dismiss, the Court "accept[s] all well-pleaded facts as true and view[s] all facts in the light most favorable to the plaintiff." *Thompson v. City of Waco, Texas*, 764 F.3d 500, 502 (5th Cir. 2014) (citation omitted). The Court "need not, however, accept the plaintiff's legal conclusions as true." *Id.* at 502-03; *see also Iqbal*, 556 U.S. at 678 ("[W]e are not bound to accept as true a legal conclusion couched as a factual allegation.").

Ultimately, "[t]o survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Although '[courts] accept all well-pled facts as true, construing all reasonable inferences in the complaint in the light most favorable to the plaintiff, conclusory allegations, unwarranted factual inferences, or legal conclusions are not accepted as true.'" *Hodge v. Engleman*, 90 F.4th 840, 843 (5th Cir. 2024) (quoting *Allen v. Hays*, 65 F.4th 736, 743 (5th Cir. 2023)).

## III. ANALYSIS

### A. Fair Housing Act Claims

Stanton Square first brings claims under the Fair Housing Act ("FHA"). Congress enacted the FHA to "provide, within constitutional limitations, for fair

housing throughout the United States." 42 U.S.C. § 3601. The FHA prohibits discrimination in the rental or sale of housing based on protected characteristics, including "race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). It provides a private right of action to any "aggrieved person" to seek "appropriate relief with respect to such discriminatory housing practice or breach." 42 U.S.C. § 3613(a)(1)(A). Any person who "claims to have been injured by a discriminatory housing practice" is an "aggrieved person," including corporations, partnerships, and associations. 42 U.S.C. § 3602(i)(1), (d). "The provisions of 42 U.S.C. § 3604 are to be given broad and liberal construction, in keeping with Congress' intent in passing the Fair Housing Act of replacing racially segregated housing with 'truly integrated and balanced living patterns.'" *Johnson v. Providence Homeowners Ass'n*, 2026 WL 27191, at *6 (E.D. Tex. Jan. 5, 2026) (quoting *Woods-Drake v. Lundy*, 667 F.2d 1198, 1201 (5th Cir. 1982)) (cleaned up).

Stanton Square brings three claims under the following provisions of the FHA: 42 U.S.C. § 3604(a) (unlawful to "make unavailable" housing because of race, color, religion, sex, familial status, or national origin); § 3604(b) (unlawful to discriminate against any person "in the terms, conditions, or privileges of sale or rental" of housing because of race, color, religion, sex, familial status, or national origin); and § 3617 (unlawful to interfere with another in the "exercise or enjoyment of, or on the account of his having aided another in the exercise or enjoyment of, any right granted or protected" in the FHA).

### 1. 42 U.S.C. § 3604(a)

In its first claim, Stanton Square alleges that Defendants are liable for the violation of its rights under the FHA, 42 U.S.C. § 3604(a), under which it is unlawful to "make unavailable . . . a dwelling to any person because of race, color, religion, sex, familial status, or national origin." Stanton Square asserts that Defendants' actions in passing an illegitimate IZD and permanently downzoning its property were based on discriminatory motives related to the race and familial status of likely residents of The Village. Stanton Square alleges that by arbitrarily changing the zoning, Defendants have violated Section 3604(a) by intentionally making housing unavailable to African Americans, Hispanics, and families with children. [28]

Plaintiffs can show a violation of provisions of the FHA by showing either that (1) the defendant acted with discriminatory intent or motive ("disparate-treatment") or (2) that the defendant's policies or practices have a "'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale" ("disparate-impact"). *Texas Dep't of Hous. & Cmty Affs v. Inclusive Cmtys. Project*, 576 U.S. 519, 524 (2015) (citation omitted). Stanton Square brings both disparate treatment and disparate impact claims under 42 U.S.C. § 3604(a).

### a. Disparate Treatment

Stanton Square alleges that Defendants acted with a discriminatory intent in blocking the development of the Village, resulting in discriminatory treatment of individuals based on their race and familial status, because the anticipated residents

---

[28] *Id.* ¶¶ 245-50.

of the Village are predominantly racial and ethnic minorities and families with children.

Disparate treatment is "deliberate discrimination." *Munoz v. Orr*, 200 F.3d 291, 299 (5th Cir. 2000). Liability on a discriminatory-treatment claim requires a finding that the protected trait motivated the action. *See Greater New Orleans Fair Hous. Action Ctr., Inc. v. Hotard*, 275 F. Supp. 3d 776, 786 (E.D. La. 2017). A plaintiff "need only prove that race was one significant factor in defendant's dealings with them in order to establish a violation of the Fair Housing Act." *Woods-Drake v. Lundy*, 667 F.2d 1198, 1202 (5th Cir. 1982); *see also Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986) ("[T]o state a claim under the Act, it is enough to show that race was a consideration and played some role in a real estate transaction.")

Discrimination is shown by either evidence of discriminatory action or inferences from differences in treatment. *L & F Homes & Dev., L.L.C. v. City of Gulfport*, 538 F. App'x 395, 401 (5th Cir. 2013). In *Arlington Heights*, the Supreme Court set out factors for courts to consider when determining whether to infer discriminatory intent. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267-68 (1977).[29] Those factors include: (1) the historical background of the decision; (2) the sequences of events preceding the challenged decision; (3) departures from normal procedure; (4) substantive departures; and (5) legislative or

---

[29] While *Arlington Heights* involved a developer's claim of discriminatory intent under the Equal Protection Clause of the Fourteenth Amendment, courts have considered *Arlington Heights's* discriminatory-intent factors in FHA cases. *See Inclusive Communities Project, Inc. v. Heartland Cmty. Ass'n, Inc.*, 824 F. App'x 210, 220 (5th Cir. 2020); *United States v. City of New Orleans*, 2012 WL 6085081, at *8 (E.D. La. Dec. 6, 2012) (citing cases).

administrative history. *Overton v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989) (citing *Arlington Heights*, 429 U.S. at 267-68).

The Court finds that Stanton Square has plausibly pled FHA claims under the *Arlington Heights* standard. At the motion to dismiss stage, a plaintiff need merely present factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *See Twombly*, 550 U.S. at 555. Application of the *Arlington Heights* factors shows that Stanton Square's claims of discriminatory treatment are plausible as pled.

As to the first and second factors, the SAC steps through the historical background of discriminatory zoning practices that have undermined efforts to establish affordable housing in the city. Within that context, Stanton Square alleges that it purchased land that since the 1980s had been zoned for multi-family housing— and that when the surrounding community learned of its plans to build racially diverse housing, the zoning suddenly changed to prevent it, which disproportionately impacted certain potential renters due to their race.[30] The SAC alleges that the community's opposition to the development, as reflected in the allegedly racially-coded public commentary and correspondence with city officials, influenced Defendants in effectuating the rezoning.[31]

---

[30] *Id*. Indeed, in *Arlington Heights*, while rejecting the developer-plaintiff's constitutional claims, the Supreme Court noted that the developer's case would have been stronger if the property in question had already been zoned multi-family but was suddenly changed to single-family once the town learned of the plans to build integrated housing. 429 U.S. at 267-68. That sequence of events is exactly what Plaintiff alleges here.

[31] ECF No. 81 ¶¶ 8, 28-43, 64-65, 74-80, 85, 111-13, 132-33, 143-45, 224.

11

Courts have found that a city's discriminatory intent may be inferred from its response to the discriminatory animus of its constituents. *See United States v. City of New Orleans*, 2012 WL 6085081, at \*9 (E.D. La. Dec. 6, 2012) (finding discrimination claims plausible where the complaint alleged the Board denied developers' variance because of "the community opposition expressed at the hearings," and noting that "several courts have held that a city may be liable for responding to public opposition"); *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*, 648 F. Supp. 2d 805, 812 (E.D. La. 2009) ("[T]he public statements are relevant both as expressing the general sentiment during the decision making process and also insofar as public opinion was specifically referenced by the decision-makers themselves."). *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 580 (2d Cir. 2003) (finding evidence of intentional discrimination, noting "the history of hostility of neighborhood residents to [the development] and their pressure on the [City] supports the court's finding that this hostility motivated the City in initiating and continuing its enforcement efforts"). Just as in those cases, the historical background and sequence of events preceding the challenged decision here—in particular, the Defendants' response to the constituents' alleged discriminatory animus—support a finding that the claim was plausibly pled at this stage.

As to the third, fourth, and fifth factors, Stanton Square plausibly alleges the decision-making process surrounding the zoning decisions was a stark break from previous substantive and procedural practices, including the City Council's "unorthodox" decision to use an IZD to halt the development; the City Council's

"exceedingly rare" decision to ignore the City Planning Commission's recommendation not to adopt the IZD; and the timing of the decision to downzone the property, described as "exceedingly uncommon" because it occurred while the City Planning Commission was undertaking a broader land use study.[32] The Court finds that these allegation are sufficient to lead to an inference that Defendants acted with discriminatory intent in creating the arbitrary and procedurally aberrant new zoning ordinance.[33] *See City of New Orleans*, 2012 WL 6085081, at \*9 (denying motion to dismiss where plaintiff alleges "the Board acted against its own recommendation and provided no explanation for any of its three variance denials.").[34]

The Court accordingly finds that Stanton Square has plausibly alleged a disparate treatment claim under the Fair Housing Act and denies Defendants' motions to dismiss as to this claim.

### b. Disparate Impact

---

[32] *Id.* ¶ 109, 122-23, 163.

[33] Defendants protest that Stanton Square's complaint is nevertheless insufficient because the zoning decisions were "facially neutral" and equally impacted property that was not Plaintiff's. But "a seemingly race-neutral policy can give rise to actionable disparate treatment" so long as the "requisite discriminatory intent is present." *Inclusive Comtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 910 (5th Cir. 2019).

[34] Defendants' reliance on *Harmony Haus Westlake LLC v. Parkstone Prop. Owners Ass'n, Inc.*, 468 F. Supp. 3d 800 (W.D. Tex. 2020), does not compel a different conclusion. There, the court found the plaintiffs failed to plead that the defendant—a homeowners' association enforcing existing traffic and parking rules with an escalating fine structure over the objections of a transitional sober living residence nearby—was "attempt[ing] to make the dwelling unavailable to Plaintiffs *due to* their handicap." *Id.* at 809 (emphasis added). The *Harmony Haus* court's analysis of the defendants' motion to dismiss was informed by a prior bench trial the court had already held between the same parties over similar issues. *See id.* at 810 (finding that the "[d]efendant was doing nothing more than following this Court's prior directive in which it counseled that Plaintiffs should know the restrictions and Defendant can demand 'strict adherence' to the restrictions"). Unlike in *Harmony Haus*, there has been no prior bench trial in this case, and all of the well-pled factual allegations in the operative complaint are taken as true without any additional limitations or findings of fact by the Court. Moreover, Defendants in this case are not attempting to enforce previously-existing traffic and parking regulations, but rather have enacted a new zoning ordinance scheme in reaction to a development plan to build multi-family housing in a particular neighborhood.

Stanton Square next alleges that Defendants' actions in blocking the development of the Village disproportionally denied housing to African American and Hispanic residents, as well as residents with children, in the relevant housing market area. Stanton Square assets that it has alleged sufficient facts to plausibly state a disparate impact claim under the FHA.

Disparate impact claims under the FHA challenge facially neutral policies or practices that have a "'disproportionately adverse effect on [a protected class] and are otherwise unjustified by a legitimate rationale.'" *Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 903 (5th Cir. 2019) (citation omitted). In *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project ("ICP")*, the Supreme Court confirmed that disparate impact claims are cognizable under the FHA. 576 U.S. 519 (2015). In *ICP*, the Court appeared to uphold—with certain modifications—the Department of Housing and Urban Development regulatory scheme's burden-shifting framework for bringing such claims, the first of which requires the plaintiff to prove a prima facie case of discrimination by showing that the challenged practice causes a discriminatory effect. *Lincoln Prop. Co.*, 920 F.3d at 901 (citing *ICP*, 576 U.S. at 542-43). In addition, however, the *ICP* Court imposed a "more demanding test" than had previously existed under the regulatory scheme: a "robust causality requirement." *Id.* at 902. To satisfy this robust causality standard, a plaintiff must plausibly allege both: (1) a specific policy attributable to the defendant, and (2) a direct causal connection between that policy and the alleged disparity. *Id.* at 908.

14

The Court finds that Stanton Square has adequately pled a disparate impact claim at the motion to dismiss stage. The point of the "robust causality" standard is to ensure that "'[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Lincoln Property*, 920 F.3d at 902 (quoting *ICP,* 576 U.S. at 542). But the Supreme Court in *ICP* also described "[s]uits targeting [] practices" such as "zoning laws and other housing restrictions that function unfairly to exclude minorities from certain neighborhoods without any sufficient justification" as being at the "heartland" of disparate impact liability. 576 U.S. at 539. That is because "[d]isparate-impact liability [under the FHA] mandates the 'removal of artificial, arbitrary, and unnecessary barriers' . . . to ensure that those priorities can be achieved without arbitrarily creating discriminatory effects or perpetuating segregation." *Id.* at 540.

Stanton Square alleges exactly that here. It asserts that Defendants enacted an artificial, arbitrary, and unnecessary zoning law without justification that would work to perpetuate segregation because its effects will disparately impact protected classes (racial minorities and families with children) who would have otherwise moved to that neighborhood. For example, the SAC alleges that both the City of New Orleans and Lower Coast Algiers are segregated: while the census block group where English Turn and Plaintiff's proposed development are located is 32.8% African American, the two census block groups abutting English Turn to the north are 85.8% African American, and the census block group to the south is just 0.5% African

American and Hispanic.[35] The SAC alleges that Defendants prevented an estimated 427 African American residents from moving into, and advancing the integration of, Lower Coast Algiers.[36] Further, Stanton Square alleges that the IZD—a first-of-its-kind measure—was abruptly adopted to alter four decades of multi-family zoning, contrary to the advice of the City's expert body on zoning matters, without real justification, and shortly after a campaign against the development that allegedly relied on discriminatory stereotypes about the residents who would be moving into the development.[37] These allegations suffice to state a "heartland" disparate-impact claim arising from "zoning laws and other housing restrictions that function unfairly to exclude minorities from certain neighborhoods without any sufficient justification." *ICP*, 576 U.S. at 539-40 (citing *Town of Huntington, N.Y. v. Huntington Branch, N.A.A.C.P.*, 488 U.S. 15, 16-18 (1988) (invalidating zoning law preventing construction of multifamily rental units); *United States v. City of Black Jack, Missouri*, 508 F.2d 1179, 1182-88 (8th Cir. 1974) (invalidating ordinance prohibiting construction of new multifamily dwellings); *Greater New Orleans Fair Housing Action Center v. St. Bernard Parish,* 641 F. Supp. 2d 563, 569, 577–578 (E.D. La. 2009) (invalidating post-Hurricane Katrina ordinance restricting the rental of housing

---

[35] ECF No. 81 ¶ 32.

[36] *Id.* ¶¶ 128-29.

[37] *Id.* ¶¶ 96–110, 116–123. What's more, Stanton Square alleges Defendants made the "exceedingly uncommon" move of proposing to downzone Plaintiff's property while its Future Land Use designation was still in flux, *id.* ¶ 163, and ultimately justified the downzoning with an "impact study" that relied on an admittedly inaccurate estimate of the scope of multi-family housing that could be built. *Id.* ¶¶ 168–182.

units to only "'blood relative[s]'" in an area of the city that was 88.3% white and 7.6% black).

Defendants protest that Stanton Square has failed to satisfy the Fifth Circuit's interpretation of the "robust causality" standard as outlined in *Lincoln Property,* 920 F.3d at 902. According to Defendants, Stanton Square does not "allege that the Council's zoning actions created or exacerbated the demographic patterns it describes." In other words, Defendants contend that because Stanton Square fails to allege that the City Council's decision to enact the IZD (and later permanently downzone the property) directly *caused* any demographic disparities, its claim is doomed under *Lincoln Property*.

The Court disagrees. Under Defendants' construction of the "robust causality" standard, it would be categorically impossible for plaintiffs to challenge any new City zoning decision that would arbitrarily prevent minorities from moving into the neighborhood. Put differently, it is difficult to see how a plaintiff could show (as Defendants require) that a public entity's recent obstruction of a private actor's proposed, future development somehow caused historic segregation or racial disparities. It is therefore unclear how a plaintiff could challenge a public entity's enactment of a new "artificial, arbitrary, and unnecessary barrier[]" that seeks to "exclude minorities from certain neighborhoods without any sufficient justification"— *i.e.*, a "heartland" disparate-impact claim. *ICP*, 576 U.S. at 540. That interpretation cannot be correct.

The Fifth Circuit's decision in *Lincoln Property* does not require a different conclusion. In *Lincoln Property*, the Fifth Circuit outlined various possible approaches—each derived from opinions of other circuits—to analyze the "robust causation" standard. 920 F.3d at 903-10. In finding that the plaintiff—who alleged a disparate impact claim against private owners of apartment complexes that refused to accept housing vouchers of potential renters—had failed to satisfy the robust causation standard under each approach, the Fifth Circuit did not endorse any one approach. *Id.*

Of the other circuits' opinions discussed in *Lincoln Property*, Stanton Square's allegations are most akin to those in *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 937 (2d Cir. 1988), *aff'd in part sub nom. Town of Huntington, N.Y. v. Huntington Branch, N.A.A.C.P.*, 488 U.S. 15 (1988). There, the Second Circuit addressed a public defendant's prohibitory enforcement of a facially neutral zoning ordinance that restricted multi-family housing to a small predominantly minority area of the city. *Id.* Contrary to Defendants' assertion, the Fifth Circuit in *Lincoln Property* did not reject *Huntington Branch's* rationale: rather, it distinguished its facts. Where *Lincoln Property* involved private landlords' decisions to participate in voluntary voucher programs, *Huntington Branch* dealt with "indefensible government policies that operated to perpetuate segregation by *unreasonably* restricting private construction of multi-family housing that would increase affordable housing options for minorities." *Lincoln Property*, 920 F.3d at 908 (emphasis in original). In other words, the Fifth Circuit found that *Huntington*

18

*Branch* was distinguishable because the defendants there were public actors attempting to impose artificial barriers on private actors who sought to build housing; crucially, they were not attempting to "impose affirmative housing obligations on private actors" as was the case in *Lincoln Property*. *Id.*  Indeed, the Fifth Circuit implied that a "heavier pleading burden" might only apply where the plaintiff seeks to "require *private* defendants to take [] *affirmative* action" such as accepting housing vouchers. *Id.* at n.11 (emphasis in original).

The Court accordingly finds that Stanton Square plausibly alleges that the public entities here enacted a restrictive zoning ordinance to artificially prevent a private entity from building affordable housing that would alleviate historic segregation in the neighborhood. These allegations suffice to state a "heartland" disparate-impact claim arising from "zoning laws and other housing restrictions that function unfairly to exclude minorities from certain neighborhoods without any sufficient justification." *ICP*, 576 U.S. at 539-40. At the motion to dismiss stage, Stanton Square's allegations have satisfied its pleading burden. The Court denies Defendants' motion to dismiss Stanton Square's disparate-impact claim.

### 2.  Terms and Conditions

Defendants move to dismiss Stanton Square's claims that the IZD and permanent downzoning collectively constitute discriminatory terms and conditions in violation of Fair Housing Act § 3604(b). Stanton Square withdrew this claim in

19

response to Defendants' motions to dismiss.[38] The Court accordingly dismisses Stanton Square's "terms and conditions" claim under § 3604(b).

### 3. Unlawful Interference

Defendants next move to dismiss Stanton Square's unlawful interference FHA claim under 42 U.S.C. § 3617.[39] Under Section 3617 of the FHA, it is unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of any right" protected by the FHA. Defendants contend that Stanton Square's unlawful interference claim must be dismissed because it has failed to state a viable claim for disparate treatment, disparate impact, or discriminatory terms and conditions under Section 3604 of the FHA. Because the Court has already found, for the reasons discussed above, that Plaintiff has plausibly alleged a viable claim under Section 3604 of the FHA, the Court denies Defendants' motion to dismiss Plaintiff's unlawful interference claim.

### B. Louisiana Equal Housing Opportunity Act Claims

Defendants move to dismiss Stanton Square's claim asserting a violation of the Louisiana Equal Housing Opportunity Act (the "LEHOA"; La. R.S. § 51:2601, *et seq*.). The LEHOA's operative provision, La. R.S. § 51:2606(A), mirrors the language of Section 3604 of the FHA, and courts interpret the statutes in parallel. *See Greater New Orleans Fair Hous. Action Ctr. v. Kelly*, 364 F. Supp. 3d 635, 648 (E.D. La. 2019). Defendants contend that Stanton Square's LEHOA claim must be dismissed because it has failed to state a viable claim under Section 3604 of the FHA. Because the Court

---

[38] ECF No. 97, at 18 n. 71.
[39] *Id.* ¶¶ 252-58.

has already found, for the reasons discussed above, that Stanton Square has plausibly alleged a viable claim under Section 3604 of the FHA, the Court denies Defendants' motion to dismiss Plaintiff's LEHOA claim.

### C. Title VI Claims

Stanton Square next brings claims against Defendants under Title VI of the Civil Rights Act of 1964. Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000(d). The core purpose of Title VI is "to stamp out discrimination in programs receiving federal funds and ensure that federal resources do not support discriminatory practices." *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 583 (5th Cir. 2020). "The essential elements of a Title VI claim are (1) there is race or national origin discrimination, and (2) the entity engaged in discrimination is receiving federal financial assistance." *Washington v. Jackson State Univ.*, 532 F. Supp. 2d 804, 810 (S.D. Miss. 2006) (citing *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio*, 40 F.3d 698, 706 n. 9 (5th Cir. 1994)).

Defendants argue, and Stanton Square concedes, that the Title VI claims against Councilmember King are legally foreclosed and therefore must be dismissed. The Fifth Circuit has made clear that "*only* public and private entities"—not individuals—can be held liable under Title VI. *Price ex rel. Price v. Louisiana Dep't of Educ.*, 329 F. App'x 559, 561 (5th Cir. 2009) (emphasis added); *see also Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 582 (5th Cir. 2020) ("[C]laims under [Title VI] may be brought only against the institution receiving federal funds, not employees of

21

those institutions."). The Title VI claims against Councilmember King are accordingly dismissed.

Next, Defendants contend the Court must dismiss the Title VI claims against the City Council because, they assert, Stanton Square has only alleged that the City—but not the City Council—received federal funds.

The Court agrees that Stanton Square has failed to allege the City Council received federal funds, dooming its claim. Stanton Square protests that the City Council plays a "direct role" in allocating federal funds by acting as the "agent" of the City and asserts it has thus adequately pled that element. But contrary to its claim in its Opposition brief,[40] Stanton Square cannot point to any allegation in its SAC that alleges the City Council received, allocated, or directed the use of federal funds. For example, in *Drayton v. McIntosh Cnty.*, 434 F. Supp. 3d. 1374, 1383 (S.D. Ga. 2020)—on which Stanton Square relies—the plaintiff expressly alleged in its complaint that the county board "directly allocat[ed] federal funds in [] discriminatory ways." The Court's "factual universe is bounded by the four corners of the complaint," *Morgan v. Swanson*, 659 F.3d 359, 401 (5th Cir. 2011), and "new allegations cannot be raised [for the first time] in a response to a motion to dismiss." *Partners & Friends Holding Corp. v. Cottonwood Minerals, L.L.C.*, 653 F. Supp. 3d 344, 351 (N.D. Tex. 2023). No such allegation exists here against the Council Defendants. The Court accordingly dismisses the Title VI claim against the Council Defendants.

---

[40] ECF No. 97 at 21-22.

Finally, the Court finds that as to the City of New Orleans, Stanton Square has plausibly alleged a claim under Title VI. Stanton Square alleges that the City "is a recipient of federal Community Development Block Grant funding" and is subject to Title VI.[41] And, contrary to the City's sole argument in opposition, the Court has already found that Stanton Square adequately alleged the City intentionally discriminated on the basis of a protected characteristic, as detailed above with respect to Plaintiff's FHA claim for intentional discrimination. *See Russell v. City of Tupelo, Mississippi*, 544 F. Supp. 3d 741, 762 (N.D. Miss. 2021) ("The burden of proof in a Title VI case is the same as that for Title VII and other civil rights statutes."). The Court accordingly denies the City's motion to dismiss as to the Title VI claim.

### D. Constitutional Due Process Claims

Defendants next contend that Stanton Square fails to state any claims against them for violations of substantive- and procedural-due-process protections under federal law. The Court agrees that Stanton Square lacks a property interest protected by the federal Due Process Clause in the City Council's approval of its plan to develop The Village, and that Stanton Square accordingly fails to state any due-process claims against the City under federal law.

The Due Process Clause of the Fourteenth Amendment guarantees that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. "The process due varies by the strength of the interests involved, but only actions that infringe enumerated interests—life, liberty,

---

[41] ECF No. 81 ¶ 37, 260.

and property—require due process." *Maurer v. Independence Town*, 870 F.3d 380, 385 (5th Cir. 2017) (citing *Tex. Faculty Ass'n v. Univ. of Tex. at Dall.*, 946 F.2d 379, 383–84 (5th Cir. 1991)). "[T]o establish either a substantive or a procedural due process violation by claiming denial of a property right," as Stanton Square aims to do here, it "must first establish a denial of a constitutionally protected property right." *Bryan v. City of Madison*, 213 F.3d 267, 274 (5th Cir. 2000) (citations omitted). "If there is no protected property interest, there is no process due[.]" *Spuler v. Pickar*, 958 F.2d 103, 105 (5th Cir. 1992) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 568 (1976)).

Property interests "are not created by the Constitution" but "are created and their dimensions are defined" by independent sources, like state law. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985). A party has a protected property interest in a benefit if that party "show[s] that [it] ha[s] a 'legitimate claim of entitlement' to the interest [it] asserts." *Wigginton v. Jones*, 964 F.3d 329, 336 (5th Cir. 2020) (quoting *Roth*, 408 U.S. at 577). "[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 756 (2005) (citations omitted). But a benefit may rise to the level of a protected entitlement if the relevant statutes or regulations "place 'substantive limitations on official discretion.'" *Ridgely v. FEMA*, 512 F.3d 727, 735 (5th Cir. 2008) (citation omitted). To decide if there are "substantive limitations on official discretion," the Court looks for "'explicitly mandatory language'" indicating that if criteria are met, a specific result must follow. *Id.* (citation omitted).

24

Against this backdrop, Stanton Square's allegations fall short because it fails to plead facts plausibly establishing a protected property interest in approval of its development plan for The Village. Stanton Square does not "cite 'explicitly mandatory language' in" the New Orleans Comprehensive Zoning Ordinance ("CZO") that would have *required* the City Council to approve the development plan for property zoned Suburban Multi-Family Residential if certain criteria were met. *Wigginton*, 964 F.3d at 337 (citation omitted). Without any "explicitly mandatory language" in the zoning rules that would have required the City Council to approve a development plan for property zoned Suburban Multi-Family Residential if relevant guidelines were met, the City Council necessarily had discretion to approve or reject Stanton Square's plan. *See Town of Castle Rock*, 545 U.S. at 756 (citations omitted). What's more, Article 4.5 CZO explicitly imposes discretionary review for new multi-family dwellings exceeding 40,000 square feet. CZO, art. 4.5.B.1. Because Stanton Square's development was over 40,000 feet, the SAC acknowledges that "even though the Project was zoned for multi-family development by right, Stanton Square was required to undergo a review by the [City's Design Advisory Committee]" before it could receive permits.[42] This meant that the permit to develop the land could be granted or denied at the government's discretion because of the size of the development.[43]

Accordingly, because the City Council had discretion to approve or reject Stanton Square's plan, Stanton Square did not have a protected property interest in approval of its plan. *Accord, e.g.*, *Da Vinci Inv., Ltd. P'ship v. City of Arlington, Texas*,

---

[42] ECF No. 81 ¶ 69.
[43] *Id.*

25

747 F. App'x 223, 226 (5th Cir. 2018) (property owner lacked a property interest protected by the Due Process Clause in city-council approval of a development plan because property owner failed to cite any explicit language in city ordinances requiring the council to approve a development plan when all guidelines are met); *L & F Homes & Dev., L.L.C. v. City of Gulfport*, 538 F. App'x 395, 406-07 (5th Cir. 2013) (rejecting due process claim where developer failed to identify state law, ordinance, or mutually explicit understanding creating entitlement to requested land use approval). Without a protected property interest, Stanton Square's due-process claims necessarily fail. *See Bryan*, 213 F.3d at 276. The Court therefore dismisses Stanton Square's due process claims for failure to state a claim upon which relief can be granted.[44]

### E. Inverse Condemnation Claim

Defendants next assert that Stanton Square fails to state a Louisiana-law regulatory-takings claim against them. The Court agrees. Because Stanton Square lacks a recognized species of property right under the Louisiana Constitution in the City Council's approval of its particular plan for development of The Village, Stanton Square fails to state a regulatory-takings claim against the City under the Louisiana Constitution.

Stanton Square's inverse condemnation claim alleges that the City's permanent downzoning of the area surrounding its property deprived it "of all

---

[44] The parties dispute whether Stanton Square has asserted a substantive due process claim in addition to a procedural due process claim. The Court need not determine whether Stanton Square asserted a substantive due process claim in the SAC because, for the reasons just stated, any such claim would fail for lack of protected property interest.

reasonable economic use" and caused "severe economic impact," amounting to a compensable taking under Article I, Section 4 of the Louisiana Constitution.[45] This "regulatory takings" claim implicates two provisions of that section: (1) Subsection (A), which guarantees "[e]very person['s] right to acquire, own, control, use, enjoy, protect, and dispose of private property"; and (2) Subsection (B)(1), which prohibits the taking or damaging of private property without just compensation. To establish a claim for inverse condemnation—that is, the taking or damaging of a property by the state absent just compensation—the plaintiff must show "(1) a recognized species of property right has been affected, (2) the property has been taken or damaged in a constitutional sense, and (3) the taking or damaging was for a public purpose." *Saloom v. Dep't of Transp. & Dev.,* 354 So. 3d 1179, 1182 (La. 2022) (citation omitted).

Stanton Square fails to plead facts sufficient to satisfy multiple of the required elements. For the reasons discussed above as to due process, Stanton Square has not alleged a cognizable property right. *See Pointe Prospect, LLC v. W. Feliciana Gov't*, 2022-1503, p. 9 (La. App. 1 Cir. 5/23/23); 368 So. 3d 1117, 1122-23 (finding that an owner or developer of property has no recognized species of property right in the development of property if development of that property is "entirely contingent" on a governing body's approval "in accordance with" the governing body's "regulatory scheme").

Further, Stanton Square fails to allege facts showing that the downzoning destroyed all or even a major portion of the Property's value or utility. *See State, Dep't*

---

[45] ECF No. 81 ¶¶ 284-88.

27

*of Soc. Servs. v. City of New Orleans*, 95-1757 (La. App. 4 Cir. 5/29/96), 676 So. 2d 149, 154, *writ denied,* 96-2143 (La. 11/8/96), 683 So. 2d 278 ("An unconstitutional taking of private property does not result merely because the owner is unable to develop it to its maximum economic potential . . . A zoning action which deprives an owner of all practical use of his property without expropriation and compensation is unconstitutional.") (internal citation omitted). The SAC alleges that the property remains zoned and suitable for single-family residential development such that it could still be developed and subdivided into low-density, single-family residential lots.[46] The fact that Stanton Square has been denied one option for developing the property does not amount to a constitutional taking. *See Major v. Pointe Coupee Par. Police Jury*, 2007-0666 (La. App. 1 Cir. 12/21/07), 978 So. 2d 952, 957 (holding that a taking does not arise from "[t]he frustration of speculative economic gain or a lost prospective business opportunity," nor the "denial of one avenue of selling or developing property"); *see also Avenal v. State*, 2003–3521, pp. 31–32 (La. 10/19/04), 886 So. 2d 1085, 1107 (finding no constitutional taking where river diversion "did not deprive [the plaintiffs] of all economically beneficial use of their [oyster leases]").

Stanton Square fails to plausibly allege an inverse condemnation claim under Louisiana law. The Court accordingly dismisses that claim.

---

[46] ECF No. 81 ¶ 235.

28

## F. Dismissal as to Councilmember King

Finally, Councilmember King moves the Court to dismiss him from the lawsuit, arguing that the official-capacity claims against him are redundant of the claims against the City Council. Official-capacity claims against Councilmember King are, "'in all respects other than name, to be treated as [claims] against'" the City Council. *McHugh v. St. Tammany Par.*, 738 F. Supp. 3d 719, 728-29 (E.D. La. 2024) (quoting *Jefferson Cmty. Health Care Centers, Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 624 (5th Cir. 2017). The Court has discretion to dismiss official-capacity claims as redundant when they are identical to claims raised against a governmental entity. *Id.*; *see also Castro Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001). King asks the Court to exercise such discretion here.

The Court finds that the exercise of discretion is appropriate. Stanton Square has not brought any claims against King in his individual capacity. The claims asserted against King in his official capacity are identical to those raised against the City Council. And Stanton Square does not dispute that any injunctive relief issued against the City Council would bind King in his role as a City Councilmember.[47]

Accordingly, the remaining claims against Councilmember King in his official capacity are dismissed.

---

[47] Stanton Square's reliance on *McHugh v. St. Tammany Parish*, in which this Court declined to exercise its discretion to dismiss an official capacity claim as redundant, is unpersuasive. In *McHugh*, the plaintiff asserted a claim against St. Tammany Parish, and not St. Tammany Parish Council. The Court declined to dismiss one of the defendants—an independently elected member of the St. Tammany Parish Council—because it was unclear whether the defendant would be bound by an injunction issued against St. Tammany Parish only. 738 F. Supp. 3d at 730. As explained, here the plaintiff does not dispute that any injunctive relief against the City Council would also bind Councilmember King in his official capacity.

29

### G. Leave to Amend

In response to the Defendants' motion to dismiss, Stanton Square did not ask for leave to amend the complaint a third time. Stanton Square has not provided notice of any amendments to be made to cure the pleading deficiencies highlighted in the Defendants' motion to dismiss. When a plaintiff fails to request leave to amend or indicate what would be added to the complaint if an amendment were allowed, the district court may dismiss the claims with prejudice. *See Joseph v. Bach & Wasserman, LLC*, 487 F. App'x 173, 178 (5th Cir. 2012) (affirming dismissal with prejudice where plaintiffs "never requested leave to amend from the district court, nor [] indicated what they would add to their complaint if allowed to amend"); *Cinel v. Connick*, 15 F.3d 1338, 1346 (5th Cir. 1994) (same).

## IV. CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendants' motions[48] to dismiss under Rule 12(b)(6) are **GRANTED IN PART** and **DENIED IN PART** as outlined above. Stanton Square's Title VI claims against the City Council, and constitutional due process and inverse condemnation claims against all Defendants, are **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that the claims against Councilmember King are **DISMISSED WITH PREJUDICE.**

---

[48] ECF Nos. 89, 93.

New Orleans, Louisiana, this 13th day of July, 2026.

_____
BRANDON S. LONG
UNITED STATES DISTRICT JUDGE